## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Baldwin County, AL; Bibb County, AL; Bullock County, AL; Cherokee County, AL; Chilton County, AL; City of Clanton, AL; Coffee County, AL; Conecuh County, AL; Cullman County, AL; Dallas County, AL; City of Cullman, AL; City of Decatur, AL; City of Demopolis, AL; Town of Double Springs, AL; City of Enterprise, AL; Etowah/Gadsden, et al., AL; City of Fort Payne, AL; Greene County, AL; City of Guin, AL; City of Hamilton, AL; City of Hartselle, AL; Lawrence County, AL; Lowndes County, AL; Madison County, AL; Marengo County, AL; City of Marion, AL; City of Mobile, AL; Mobile County, AL; Morgan County, AL; City of Moulton, AL; City of Opp, AL; City of Ozark, AL; City of Phenix City, AL; Pike County, AL; City of Selma, AL; Sumter County, AL; Tallapoosa County, AL; City of Troy, AL; Tuscaloosa County, AL; City of Union Springs, AL; Washington County, AL; Wilcox County, AL; Amador County, CA, acting by and through the County Counsel; Butte County, CA, acting by and through the County Counsel; Calaveras County, CA, acting by and through the County Counsel; Contra Costa County, CA, acting by and through the County Counsel; Del Norte County, CA, acting by and through the County Counsel; El Dorado County, CA, acting by and through the County Counsel; Fresno County, CA, acting by and through the County Counsel; Glenn County, CA, acting by and through the County Counsel; Imperial County, CA, acting by and through the County Counsel; Inyo County, CA, acting by and through the County Counsel; Lassen County, CA, acting by and through the County Counsel; Madera County, CA, acting by and through the County Counsel; Mariposa County, CA, acting by and through the County Counsel; Mendocino County, CA, acting by and through the County Counsel; Merced County, CA, acting by and through the County Counsel; Modoc County, CA, acting by and through the County Counsel; [Caption continued on following page] | Civil Action No. <u>1:19-cv-2421</u><br><br><br><br>**<u>COMPLAINT</u>** |

Mono County, CA, acting by and through the
County Counsel; Monterey County, CA, acting by
and through the County Counsel; Nevada County,
CA, acting by and through the County Counsel;
Placer County, CA, acting by and through the
County Counsel; Plumas County, CA, acting by
and through the County Counsel; Sacramento
County, CA, acting by and through the County
Counsel; San Benito County, CA, acting by and
through the County Counsel; San Diego County,
CA, acting by and through the County Counsel;
Shasta County, CA, acting by and through the
County Counsel; Siskiyou County, CA, acting by
and through the County Counsel; Sutter County,
CA, acting by and through the County Counsel;
Tehama County, CA, acting by and through the
County Counsel; Trinity County, CA, acting by
and through the County Counsel; Tuolumne
County, CA, acting by and through the County
Counsel; Yolo County, CA, acting by and through
the County Counsel; Yuba County, CA, acting by
and through the County Counsel; Bay County,
FL; City of Bradenton, FL; Calhoun County, FL;
Escambia County, FL; Gulf County, FL;
Hernando County, FL; Holmes County, FL;
Jackson County, FL; Leon County, FL; City of
Miami Gardens, FL; Miami-Dade County, FL;
City of North Miami, FL; City of Panama City,
FL; Pasco County, FL; City of Pensacola, FL;
Pinellas County, FL; City of Pinellas Park, FL;
Santa Rosa County, FL; City of St. Petersburg,
FL; City of Tallahassee, FL; Volusia County, FL;
City of Albany, GA; City of Augusta, GA;
Bartow County, GA; City of Columbus, GA;
Laurens County, GA; Lee County, GA; Monroe
County, GA; Polk County, GA; Union County,
GA; Wilkinson County, GA; Alexander County,
by and through the State's Attorney of Alexander
County, IL; Bond County, by and through the
State's Attorney of Bond County, IL; Calhoun
County, by and through the State's Attorney of
Calhoun County, IL; Christian County, by and
through the State's Attorney of Christian County,
IL; Coles County, by and through the State's
Attorney of Coles County, IL;

[Caption continued on following page]

Edwards County, by and through the State's
Attorney of Edwards County, IL; Effingham
County, by and through the State's Attorney of
Effingham County, IL; Gallatin County, by and
through the State's Attorney of Gallatin County,
IL; Hamilton County, by and through the State's
Attorney of Hamilton County, IL; Hardin County,
by and through the State's Attorney of Hardin
County, IL; Jasper County, by and through the
State's Attorney of Jasper County, IL; Jefferson
County, by and through the State's Attorney of
Jefferson County, IL; Johnson County, by and
through the State's Attorney of Johnson County,
IL; Lawrence County, by and through the State's
Attorney of Lawrence County, IL; Lee County, by
and through the State's Attorney of Lee County,
IL; Livingston County, by and through the State's
Attorney of Livingston County, IL; Marion
County, by and through the State's Attorney of
Marion County, IL; Massac County, by and
through the State's Attorney of Massac County,
IL; City of Metropolis, a Municipal Corporation,
IL; Pulaski County, by and through the State's
Attorney of Pulaski County, IL; City of Rockford,
a Municipal Corporation, IL; Saline County, by
and through the State's Attorney of Saline County,
IL; Schuyler County, by and through the State's
Attorney of Schuyler County, IL; Shelby County,
by and through the State's Attorney of Shelby
County, IL; Wabash County, by and through the
State's Attorney of Wabash County, IL;
Washington County, by and through the State's
Attorney of Washington County, IL; White
County, by and through the State's Attorney of
White County, IL; Winnebago County, by and
through the State's Attorney of Winnebago
County, IL; Town of Atlanta, IN;
City of Beech Grove, IN; Blackford County, IN;
Town of Brownstown, IN; Town of Chandler, IN;
City of Evansville, IN; City of Fishers, IN;
City of Fort Wayne, IN; City of Greenwood, IN;
Harrison County, IN; City of Hartford, IN;
Howard County, IN; City of Huntington, IN;
Jackson County, IN; City of Jasper, IN; City of
Jeffersonville, IN; City of Kokomo, IN;
[Caption continued on following page]

City of Lawrence, IN; City of Martinsville, IN;
City of Montpelier, IN; Town of Mooresville, IN;
City of Muncie, IN; City of New Albany, IN; City
of Noblesville, IN; City of Peru, IN; Town of
Plainfield, IN; City of Seymour, IN; City of
Shelbyville, IN; Town of Sheridan, IN; City of
South Bend, IN; Starke County, IN; City of Terre
Haute, IN; Tippecanoe County, IN; Town of
Upland, IN; Vigo County, IN; City of Westfield,
IN; Town of Zionsville, IN; Board of
Commissioners of Cherokee County, KS; Board
of Commissioners of Cowley County, KS; Board
of Commissioners of Pratt County, KS; Board of
Commissioners of Sedgwick County, KS; The
Fiscal Court of Allen County, on behalf of Allen
County, KY; The Fiscal Court of Anderson
County, on behalf of Anderson County, KY; The
Fiscal Court of Bell County, on behalf of Bell
County, KY; The Fiscal Court of Boone County,
on behalf of Boone County, KY; The Fiscal Court
of Boyd County, on behalf of Boyd County, KY;
The Fiscal Court of Boyle County, on behalf of
Boyle County, KY; The Fiscal Court of Bracken
County, on behalf of Bracken County, KY; The
Fiscal Court of Bullitt County, on behalf of Bullitt
County, KY; The Fiscal Court of Campbell
County, on behalf of Campbell County, KY; The
Fiscal Court of Carlisle County, on behalf of
Carlisle County, KY; The Fiscal Court of Carter
County, on behalf of Carter County, KY; The
Fiscal Court of Christian County, on behalf of
Christian County, KY; The Fiscal Court of Clark
County, on behalf of Clark County, KY; The
Fiscal Court of Clay County, on behalf of Clay
County, KY; The Fiscal Court of Cumberland
County, on behalf of Cumberland County, KY;
The Fiscal Court of Elliott County, on behalf of
Elliott County, KY; The Fiscal Court of Fleming
County, on behalf of Fleming County, KY; The
Fiscal Court of Franklin County, on behalf of
Franklin County, KY; The Fiscal Court of Garrard
County, on behalf of Garrard County, KY; The
Fiscal Court of Greenup County, on behalf of ,
KY; The Fiscal Court of Harlan County, on behalf
of Harlan County, KY;

[Caption continued on following page]

The Fiscal Court of Henderson County, on behalf of Henderson County, KY; The Fiscal Court of Henry County, on behalf of Henry County, KY; The Fiscal Court of Hopkins County, on behalf of Hopkins County, KY; The Fiscal Court of Jessamine County, on behalf of Jessamine County, KY; The Fiscal Court of Kenton County, on behalf of Kenton County, KY; The Fiscal Court of Knox County, on behalf of Knox County, KY; The Fiscal Court of Laurel County, on behalf of Laurel County, KY; The Fiscal Court of Leslie County, on behalf of Leslie County, KY; The Fiscal Court of Letcher County, on behalf of Letcher County, KY; Lexington-Fayette Urban County Government, KY; The Fiscal Court of Lincoln County, on behalf of Lincoln County, KY; City of Louisville/ Jefferson Metro Government, KY; The Fiscal Court of Madison County, on behalf of Madison County, KY; The Fiscal Court of Marshall County, on behalf of Marshall County, KY; The Fiscal Court of Martin County, on behalf of Martin County, KY; The Fiscal Court of Montgomery County, on behalf of Montgomery County, KY; The Fiscal Court of Nicholas County, on behalf of Nicholas County, KY; The Fiscal Court of Oldham County, on behalf of Oldham County, KY; The Fiscal Court of Pendleton County, on behalf of Pendleton County, KY; The Fiscal Court of Perry County, on behalf of Perry County, KY; The Fiscal Court of Powell County, on behalf of Powell County, KY; The Fiscal Court of Pulaski County, on behalf of Pulaski County, KY; The Fiscal Court of Rowan County, on behalf of Rowan County, KY; The Fiscal Court of Scott County, on behalf of Scott County, KY; The Fiscal Court of Shelby County, on behalf of Shelby County, KY; The Fiscal Court of Spencer County, on behalf of Spencer County, KY; The Fiscal Court of Union County, on behalf of Union County, KY; The Fiscal Court of Wayne County, on behalf of Wayne County, KY; The Fiscal Court of Whitley County, on behalf of Whitley County, KY; The Fiscal Court of Woodford County, on behalf of Woodford County, KY;

[Caption continued on following page]

City of Baton Rouge, Parish of East Baton Rouge, LA; City of Saint Martinville, LA; Parish of St. John the Baptist, LA; Allegany County, MD; Cecil County, MD; City of Cumberland, MD; City of Frostburg, MD; City of Hagerstown, MD; St. Mary's County, MD; Washington County, MD; Town of Acushnet, MA; City of Agawam, MA; City of Amesbury, MA; Town of Aquinnah, MA; Town of Athol, MA; Town of Auburn, MA; Town of Barnstable, MA; Town of Belchertown, MA; City of Beverly, MA; Town of Billerica, MA; Town of Brewster, MA; Town of Bridgewater, MA; City of Brockton, MA; Town of Brookline, MA; Town of Carver, MA; Town of Charlton, MA; Town of Chelmsford, MA; City of Chelsea, MA; Town of Clarksburg, MA; Town of Danvers, MA; Town of Dedham, MA; Town of Dennis, MA; Town of Douglas, MA; Town of Dudley, MA; Town of East Bridgewater, MA; Town of Eastham, MA; City of Easthampton, MA; City of Everett, MA; Town of Fairhaven, MA; Town of Falmouth, MA; Town of Franklin, MA; Town of Freetown, MA; Town of Georgetown, MA; Town of Grafton, MA; City of Greenfield, MA; Town of Hanson, MA; Town of Holliston, MA; City of Holyoke, MA; Town of Hopedale, MA; Town of Kingston, MA; Town of Lakeville, MA; Town of Leicester, MA; City of Leominster, MA; Town of Leverett, MA; Town of Longmeadow, MA; City of Lowell, MA; Town of Ludlow, MA; Town of Lunenburg, MA; City of Lynn, MA; City of Malden, MA; Town of Marblehead, MA; Town of Marshfield, MA; Town of Mashpee, MA; Town of Mattapoisett, MA; City of Melrose, MA; City of Methuen, MA; Town of Middleborough, MA;
Town of Milford, MA; Town Millbury, MA; Town of Nantucket, MA; City of Newburyport, MA; City of North Adams, MA; Town of North Andover, MA; Town of North Attleborough, MA; Town of North Reading, MA; City of Northampton, MA; Town of Northbridge, MA; Town of Norton, MA; Town of Norwell, MA; Town of Norwood, MA; Town of Orange, MA; Town of Palmer, MA; City of Peabody, MA;
[Caption continued on following page]

Town of Pembroke, MA; City of Pittsfield, MA;
Town of Plainville, MA; Town of Plymouth, MA;
Town of Provincetown, MA; Town of Rehoboth,
MA; City of Revere, MA; Town of Rockland,
MA; Town of Salisbury, MA; Town of Sandwich,
MA; Town of Scituate, MA; Town of Seekonk,
MA; Town of Sheffield, MA; Town of Shirley,
MA; Town of Somerset, MA; Town of South
Hadley, MA; Town of Southbridge, MA; Town of
Spencer, MA; Town of Stoneham, MA; Town of
Stoughton, MA; Town of Sturbridge, MA; Town
of Sudbury, MA; Town of Sutton, MA; Town of
Swampscott, MA; Town of Templeton, MA;
Town of Tewksbury, MA; Town of Truro, MA;
Town of Tyngsborough, MA; Town of Upton,
MA; Town of Walpole, MA; Town of Ware, MA;
Town of Warren, MA; Town of Watertown, MA;
Town of West Boylston, MA; Town of West
Bridgewater, MA; Town of West Springfield,
MA; Town of West Tisbury, MA; Town of
Westborough, MA; Town of Westford, MA;
Town of Williamsburg, MA; Town of
Wilmington, MA; Town of Winchendon, MA;
Town of Winthrop, MA; City of Woburn, MA;
Branch County, MI; Charter Township of Canton,
MI; Charter Township of Clinton, MI; Eaton
County, MI; Charter Township of Huron, MI;
City of Livonia, MI; Muskegon County, MI;
Charter Township of Northville, MI; City of
Romulus, MI; Charter Township of Van Buren,
MI; City of Wayne, MI; Adams County, MS;
Amite County, MS; City of Amory, MS; Benton
County, MS; City of Charleston, MS; City of
Columbia, MS; Forrest County, MS; Franklin
County, MS; City of Greenwood, MS; City of
Hattiesburg, MS; Holmes County, MS;
Itawamba County, MS; City of Iuka, MS;
Jefferson County, MS; Jefferson Davis County,
MS; City of Laurel, MS; Lafayette County, MS;
Lawrence County, MS; County of Leflore, MS;
Lincoln County, MS; Marion County, MS;
Marshall County, MS; City of Meridian, MS;
Monroe County, MS; Neshoba County, MS; City
of New Albany, MS; County of Pearl River, MS;
Perry County, MS; Prentiss County, MS;
[Caption continued on following page]

Stone County, MS; Tallahatchie County, MS;
Tippah County, MS; Union County, MS; Walthall
County, MS; City of Wiggins, MS; Audrain
County, MO; Cole County, MO; Gasconade
County, MO; Lewis County, MO; Maries County,
MO; Miller County, MO; Moniteau County, MO;
Montgomery County, MO; Osage County, MO;
Ozark County, MO; Phelps County, MO; Pulaski
County, MO; Randolph County, MO; Reynolds
County, MO; Ripley County, MO; Shannon
County, MO; Shelby County, MO; Warren
County, MO; Webster County, MO Sarpy
County, NE; City of South Sioux City, NE; Nye
County, NV; Town of Derry, NH; City of
Franklin, NH; City of Laconia, NH; Town of
Londonderry, NH; Board of Commissioners of
the County of Bernalillo County, NM; Board of
Commissioners of the County of Doña Ana, NM;
Board of Commissioners of the County of Lea
County, NM; Board of County Commissioners of
the County of McKinley, NM; Board of
Commissioners of the County of Otero County,
NM; Board of Commissioners of the County of
Taos County, NM; Board of Commissioners of
the County of Socorro, NM; Board of
Commissioners of the County of Curry, NM;
Board of Commissioners of the County of
Valencia, NM; Board of Commissioners of the
County of Sierra, NM; Board of Commissioners
of the County of Catron, NM; Board of
Commissioners of the County of Cibola, NM;
Alexander County, NC; Alleghany County, NC;
Anson County, NC; Ashe County, NC; Beaufort
County, NC; Brunswick County, NC; Buncombe
County, NC; Burke County, NC;
Caldwell County, NC; Camden County, NC;
Carteret County, NC; Caswell County, NC;
Catawba County, NC; Cherokee County, NC;
Chowan County, NC; Columbus County, NC;
Craven County, NC; Cumberland County, NC;
Currituck County, NC; Dare County, NC; Davie
County, NC; Duplin County, NC; City of
Fayetteville, NC; Forsyth County, NC; Franklin
County, NC; Gaston County, NC; Greene County,
NC; Halifax County, NC; Haywood County, NC;
[Caption continued on following page]

City of Henderson, NC; City of Hickory, NC;
City of Jacksonville, NC; Jones County, NC;
Lenoir County, NC; Lincoln County, NC;
Madison County, NC; Martin County, NC;
McDowell County, NC; Moore County, NC; New
Hanover County, NC; Onslow County, NC;
Orange County, NC; Pamlico County, NC;
Pasquotank County, NC; Person County, NC; Pitt
County, NC; Polk County, NC; Randolph County,
NC; Richmond County, NC; Rockingham
County, NC; Rowan County, NC; Rutherford
County, NC; Stokes County, NC; Surry County,
NC; Tyrrell County, NC; Vance County, NC;
Warren County, NC; Washington County, NC;
Watauga County, NC; Wayne County, NC;
Wilkes County, NC; City of Wilmington, NC;
City of Winston-Salem, NC; Yadkin County, NC;
Yancey County, NC; Adams County Board of
Commissioners, OH; City of Ashland, OH;
Ashland County Board of Commissioners, OH;
Athens County Board of Commissioners, OH;
Auglaize County Board of Commissioners, OH;
Belmont County Board of Commissioners, OH;
Brown County Board of Commissioners, OH;
Carroll County Board of Commissioners, OH;
Champaign County Board of Commissioners,
OH; City of Cincinnati, OH; Clermont County
Board of Commissioners, OH; City of Cleveland,
OH; Columbiana County Board of
Commissioners, OH; Coshocton County Board of
Commissioners, OH; Crawford County Board of
Commissioners, OH; Darke County Board of
Commissioners, OH; Delaware County Board of
Commissioners, OH; Erie County Board of
Commissioners, OH; Fairfield County Board of
Commissioners, OH; Franklin County Board of
Commissioners, OH; Gallia County Board of
Commissioners, OH; Geauga County Board of
Commissioners, OH; Guernsey County Board of
Commissioners, OH; City of Hamilton, OH;
Hamilton County Board of Commissioners, OH;
Hocking County Board of Commissioners, OH;
Huron County Board of Commissioners, OH; City
of Ironton, OH;
[Caption continued on following page]

Jackson County Board of Commissioners, OH;
Knox County Board of Commissioners, OH;
Lawrence County Board of Commissioners, OH;
City of Lebanon, OH; Licking County Board of
Commissioners, OH; Logan County Board of
Commissioners, OH; Marion County Board of
Commissioners, OH; Mercer County Board of
Commissioners, OH; Monroe County Board of
Commissioners, OH; Morrow County Board of
Commissioners, OH; Muskingum County Board
of Commissioners, OH; Ottawa County Board of
Commissioners, OH; Perry County Board of
Commissioners, OH; Pike County Board of
Commissioners, OH; City of Portsmouth, OH;
Ross County Board of Commissioners, OH;
Scioto County Board of Commissioners, OH;
Seneca County Board of Commissioners, OH;
Shelby County Board of Commissioners, OH;
Vinton County Board of Commissioners, OH;
Wayne County Board of Commissioners, OH;
Williams County Board of Commissioners, OH;
Wyandot County Board of Commissioners, OH;
City of Portland, OR; Columbia County, PA;
Fairview Township, PA; Indiana County, PA;
Luzerne County, PA; City of Nanticoke, PA;
Plains Township, PA; City of Wilkes-Barre, PA;
Wyoming County, PA; Town of Barrington, RI;
Town of Bristol, RI; Town of Burrillville, RI;
City of Central Falls, RI; Town of Charlestown,
RI; Town of Coventry, RI; City of Cranston, RI;
Town of Cumberland, RI; Town of East
Greenwich, RI; City of East Providence, RI;
Town of Foster, RI; Town of Gloucester, RI;
Town of Hopkinton, RI; Town of Jamestown, RI;
Town of Johnston, RI; Town of Middletown, RI;
Town of Narragansett, RI; City of Newport, RI;
Town of North Kingstown, RI; Town of North
Providence, RI; City of Pawtucket, RI; Town of
Richmond, RI; Town of Scituate, RI; Town of
Smithfield, RI; Town of South Kingstown, RI;
City of Warwick, RI; Town of West Greenwich,
RI; Town of Warren, RI; Town of West Warwick,
RI; Town of Westerly, RI; City of Woonsocket,
RI; Campbell County, TN; Crockett County, TN;
Fentress County, TN; Greene County, TN;

[Caption continued on following page]

Hancock County, TN; Hawkins County, TN;
Haywood County, TN; Henderson County, TN;
Johnson County, TN; Lauderdale County, TN;
City of Lexington, TN; Madison County, TN;
Montgomery County, TN; Overton County, TN;
Pickett County, TN; Washington County, TN;
Williamson County, TN; Carbon County, UT;
Utah County, UT; City of Danville, VA; City of
Richmond, VA; Scott County Board of
Supervisors, VA; City of Virginia Beach and the
Sheriff of the City of Virginia Beach, VA; Boone
County Commission, WV; Fayette County
Commission, WV; Greenbrier County
Commission, WV; Kanawha County Commission,
WV; Logan County Commission, WV; City of
Vienna, WV; Wayne County Commission, WV;
Dane County, WI; Milwaukee County, WI;
Walworth County, WI; Waukesha County, WI;
Eastern Band of Cherokee Indians; Oneida Nation;
Red Lake Band of Chippewa Indians; Seneca
Nation; Lower Brule/Sioux Tribe; Tule River
Tribe of California; White Earth Tribe of
Minnesota Chippewa; and The Blackfeet Tribe of
the Blackfeet Indian Reservation,

Plaintiffs,

v.

RICHARD S. SACKLER, JONATHAN D.
SACKLER, MORTIMER D.A. SACKLER,
KATHE A. SACKLER, ILENE SACKLER
LEFCOURT, BEVERLY SACKLER,
THERESA SACKLER, DAVID A. SACKLER,
TRUST FOR THE BENEFIT OF MEMBERS OF
THE RAYMOND SACKLER FAMILY,
RHODES PHARMACEUTICALS L.P.,

Defendants.

**TABLE OF CONTENTS**

I.      INTRODUCTION .................................................................................... 1

II.     PARTIES ............................................................................................... 8

III.    JURISDICTION AND VENUE .............................................................. 21

IV.     FACTUAL ALLEGATIONS ................................................................... 22

        A.      Purdue's False Marketing Tactics Created an Overwhelming Demand for
        Prescription Opioid and Purdue's Failure to Report Known Over-Proscribing Doctors
        Supported the Explosive Market Growth of Opioids ........................................ 22

                1.      The Defendants' Multi-Pronged Scheme to Change Prescriber Habits and Public
                        Perception and Increase Demand for Opioids ................................... 22

                        a.      The Sackler Defendants, and Purdue Promoted Multiple
                                Falsehoods About Opioids ................................................... 23

                2.      The Sackler Defendants Deliberately Directed Purdue and Rhodes to Disregard
                        Their Duties to Maintain Effective Controls and to Identify, Report, and Take
                        Steps to Halt Suspicious Orders .................................................. 47

                        a.      Purdue and Rhodes Have a Duty to Report Suspicious Orders and
                                Not to Ship Those Orders Unless Due Diligence Disproves Their
                                Suspicions .................................................................... 49

                        b.      Defendants Kept Careful Track of Prescribing Data and Knew
                                About Suspicious Orders and Prescribers .............................. 53

        B.      The Sackler Defendants Utilized Purdue to Perpetrate their Scheme to Grow the
        Demand for Prescription Opioids ...................................................................... 56

                1.      The Sackler Defendants' Misconduct Leading to the 2007 Judgment .............. 58

                2.      The Sackler Defendants' Misconduct from the 2007 Judgment Until Today ..... 65

                        a.      2007 ................................................................................ 67

                        b.      2008 ................................................................................ 70

                        c.      2009 ................................................................................ 80

                        d.      2010 ................................................................................ 86

                        e.      2011 ................................................................................ 96

                        f.      2012 ................................................................................ 106

                        g.      2013 ................................................................................ 113

                        h.      2014 ................................................................................ 123

                        i.      2015 ................................................................................ 132

                        j.      2016 ................................................................................ 135

                        k.      2017 ................................................................................ 140

                        l.      2018 ................................................................................ 143

i

     C.      The Sackler Defendants Created Rhodes to Perpetuate and Further Profit Off of the Opioid Market that the Sackler Defendants had Created with Purdue ..................... 144

       1.      Similarities Between Rhodes and Purdue ......................................................... 145

       2.      How The Sackler Defendants Used Purdue and Rhodes Together to Further the Sackler Defendants' Scheme to Falsely Market Opioids.................................. 145

V.      CAUSES OF ACTION ................................................................................................ 147

FIRST CAUSE OF ACTION.................................................................................................. 147

SECOND CAUSE OF ACTION............................................................................................. 148

THIRD CAUSE OF ACTION ................................................................................................. 160

FOURTH CAUSE OF ACTION............................................................................................. 161

FIFTH CAUSE OF ACTION .................................................................................................. 162

PRAYER FOR RELIEF.......................................................................................................... 165

JURY DEMAND ..................................................................................................................... 165

# I.     INTRODUCTION

1.      This nation is facing an unprecedented opioid addiction epidemic that was initiated and perpetuated by the Sackler Defendants for their own financial gain, to the detriment of each of the Plaintiffs and their residents.  The "Sackler Defendants" include Richard Sackler, Beverly Sackler, David Sackler, Ilene Sackler Lefcourt, Jonathan Sackler, Kathe Sackler, Mortimer Sackler, and Theresa Sackler. The Sackler Defendants carried out their enterprise to falsely market prescription opioids as safe and non-addictive through their closely held companies including: Purdue Pharma L.P., the Purdue Frederick Company, Purdue Pharmaceutical Products L.P. and Purdue Products L.P. (collectively "Purdue") and Rhodes Pharmaceuticals L.P. ("Rhodes").

2.      In 2014, more than 47,000 people died in the United States from lethal drug overdoses.  In 2015, that number exceeded 52,000.[1]  In 2016, it exceeded 63,000 – more than the number of Americans who died during the entirety of the Vietnam War, and more than the number of Americans who die from breast cancer every year.[2]  Sadly, this trend shows no sign of slowing.  The number of overdose deaths in 2017 is estimated to have been more than 72,000.[3]

3.      More than three out of five of those deaths involve opioids—a dangerous, highly addictive and often lethal class of natural, synthetic and semi-synthetic painkillers.[4]  Prescription opioids include brand-name medications like OxyContin, Opana, Subsys, Fentora and Duragesic, as well as generics like oxycodone, methadone and fentanyl.  In all, more than 200,000 people

---

[1]     *Overdose Death Rates*, National Institute of Drug Abuse, https://www.drugabuse.gov/related-topics/trends-statistics/overdose-death-rates (hereinafter, "*Overdose Death Rates*") (last visited Dec. 14, 2018).
[2]     *Vietnam War U.S. Military Fatal Casualty Statistics*, National Archives, https://www.archives.gov/research/military/vietnam-war/casualty-statistics.html (last visited Dec. 14, 2018); Rose A. Rudd et al., *Increases in Drug and Opioid Involved Overdose Deaths – United States, 2010-2015*, 65 Morbidity & Mortality Weekly Report 1445-52 (2016), https://www.cdc.gov/mmwr/volumes/65/wr/mm655051e1.htm (hereinafter, "Rudd, *Increases in Drug and Opioid Involved Overdose*"); Nadia Kounang, *Opioids now kill more people than breast cancer*, CNN (Dec. 21, 2017), https://www.cnn.com/2017/12/21/health/drug-overdoses-2016-final-numbers/index.html.
[3]     Centers for Disease Control and Prevention National Center for Health Statistics, *Vital Statistics Rapid Release Provisional Drug overdose Death Counts*, https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm (last visited Dec. 14, 2018).
[4]     And nearly half of those involve legal opioids prescribed by doctors to treat pain.

died in the United States between 1999 and 2016 from overdoses directly related to prescription opioids.

4.      That number does not take into account the staggering number of additional illicit opioid deaths that can be related back to prescribed opioids.  Four out of five new heroin users began first with prescription opioid misuse.[5]  It is thus unsurprising that heroin overdose deaths increased in lockstep with those attributed to prescription opioids; the Centers for Disease Control found a fivefold increase in the heroin death rate between 2002 and 2014.[6]  According to an article published in the *New England Journal of Medicine*, two studies found that almost 80% of heroin users reported using prescription opioids before initiating heroin use.[7]  Further, heroin use increased almost 140% among non-medical users of prescription opioids from the period 2002-2004 to the period 2011-2013.[8]  These changes appear to be driven primarily by market forces – "increased accessibility, reduced price, and high purity of heroin appear to be major drivers of the recent increases in rates of heroin use" and predate most policies aimed at combatting the abuse and diversion of prescription opioids.[9]

5.      Further, according to Robert Anderson ("Anderson"), Chief of the Mortality Statistics Branch of the National Center for Health Statistics, deaths from synthetic opioids have undergone "more than an exponential increase"[10] with an expected trend line for 2017 deaths that "will be at least as steep as 2016, if not steeper."[11]  Between 2005 and 2016, fatal overdoses from

---

[5]     Christopher M. Jones, *Heroin use and heroin use risk behaviors among nonmedical users of prescription opioid pain relievers – United States, 2002-2004 and 2008-2010*, 132 (1-2) Drug and Alcohol Dependence 95-100 (Sept. 1, 2013), http://www.drugandalcoholdependence.com/article/ S0376-8716(13)00019-7/fulltext.

[6]     Centers for Disease Control and Prevention National Center for Health Statistics, *Number and age-adjusted rates of drug-poisoning deaths involving opioid analgesics and heroin: United States, 1999-2014*, http://www.cdc.gov/nchs/data/health_policy/AADR_drug_poisoning_involving_OA_Heroin_US_2000-2014.pdf (last visited Dec. 14, 2018).

[7]     Wilson M. Compton et al., *Relationship between Nonmedical Prescription-Opioid Use and Heroin Use*, 374 N. Eng. J. Med 154-63 (2016), https://www.nejm.org/doi/full/10.1056/ NEJMra1508490.

[8]     *Id.*

[9]     *Id.*

[10]    Internal quotation marks are omitted throughout this complaint except where the internal quotation marks set off a quote that resides within a longer quoted passage.

[11]    Christopher Ingraham, *CDC releases grim new opioid overdose figures: 'We're talking about more than an exponential increase,'* Wash. Post (Dec. 21, 2017), https://www.washingtonpost.com/news/wonk/wp/2017/12/21/cdc-releases-grim-new-opioid-overdose-figures-were-talking-about-more-than-an-exponential-increase/?utm_term=.ad8576e16bea.

synthetic opioids doubled.  "This surge in overdose deaths resulted in the first two-year drop in average U.S. life expectancy since the early 1960s."  In all, more than 200,000 people died in the United States between 1999 and 2016 from overdoses directly related to prescription opioids.[12]

6.      Public health officials have called the current opioid epidemic the worst drug crisis in American history.[13]  According to Anderson, "I don't think we've ever seen anything like this.  Certainly not in modern times."[14]  On October 26, 2017, President Donald Trump declared it a public health emergency.  According to recent estimates, as many as 145 people in the United States die every day from opioid overdoses.[15]

7.      The following charts[16] illustrate the rise of opioid-related overdose deaths in the United States:[17]



8.      The opioid crisis and related expenses continue to grow.  According to a report issued on February 13, 2018 by Altarum, a nonprofit health systems research and consulting

---

[12]   *Prescription Opioid Overdose Data*, Centers for Disease Control and Prevention: Opioid Overdose, https://www.cdc.gov/drugoverdose/data/overdose.html (last visited Dec. 14, 2018).
[13]   Julie Bosman, *Inside a Killer Drug Epidemic: A Look at America's Opioid Crisis*, N.Y. Times (Jan. 6, 2017), https://www.nytimes.com/2017/01/06/us/opioid-crisis-epidemic.html.
[14]   *Drug overdoses now kill more Americans than guns*, CBS News (Dec. 9, 2016), https://www.cbs news.com/news/drug-overdose-deaths-heroin-opioid-prescription-painkillers-more-than-guns/.
[15]   Patrick R. Keefe, *The Family that Built an Empire of Pain*, The New Yorker (Oct. 30, 2017), https://www.newyorker.com/magazine/2017/10/30/the-family-that-built-an-empire-of-pain  (hereinafter,  "Keefe, *Empire of Pain*").
[16]   German Lopez & Sarah Frostenson, *How the opioid epidemic became America's worst drug crisis ever, in 15 maps and charts*, Vox (Mar. 29, 2017), http://www.vox.com/science-and-health/2017/3/23/14987892/opioid-heroin-epidemic-charts (hereinafter, "Lopez, *How the opioid epidemic*").
[17]   *Overdose Death Rates*, *supra* note 1.

organization, the cost of the country's opioid crisis is estimated to have exceeded $1 trillion from 2001 to 2017, and is projected to cost an additional $500 billion by 2020:[18]



Indeed, the Council of Economic Advisers, an agency within the Executive Office of the President of the United States, concluded in a November 2017 report that the economic cost of the opioid crisis was $504 billion in 2015 alone.  That figure is 2.8% of the 2015 gross domestic product.[19]

9.      According to a Centers for Disease Control and Prevention ("CDC") report issued in March 2018, hospital emergency room visits for opioid overdoses rose 30% nationwide between July 2016 and September 2017, with overdoses increasing by 54% in large cities:

---

[18]  *Economic Toll Of Opioid Crisis In U.S. Exceeded $1 Trillion Since 2001*, Altarum (Feb. 13, 2018), https://altarum.org/about/news-and-events/economic-toll-of-opioid-crisis-in-u-s-exceeded-1-trillion-since-2001.
[19]  The Council of Economic Advisors, *The Underestimated Cost of the Opioid Crisis* 1 (Nov. 2017), https://www.whitehouse.gov/sites/whitehouse.gov/files/images/The%20Underestimated%20Cost%20of%20the%20Opioid%20Crisis.pdf.



10.     Drug manufacturers' deceptive marketing and sale of opioids to treat chronic pain is one of the main drivers of the opioid epidemic.  Historically, prescription opioids had been used for short-term, post-surgical and trauma-related pain, and for palliative end-of-life care primarily in cancer patients.  Because opioids are highly addictive and dangerous, the U.S. Food and Drug Administration ("FDA") regulates them as Schedule II Controlled Substances, *i.e.*, drugs that have a high potential for abuse and that may lead to severe psychological or physical dependence.

11.     This demonstrated need for caution comports with the historical understanding of both the medical community and the American culture at large regarding the serious consequences of opioid use and misuse.  Indeed, thousands of years of experience have taught that opioids' ability to relieve pain comes at a steep price; opioids are dangerously addictive and often lethal substances.  For generations, physicians were taught that opioid painkillers were highly addictive and should be used sparingly and primarily for patients near death.[20]  The medical community also understood that opioids were poorly suited for long-term use because tolerance would require escalating doses and dependence would make it extremely difficult to discontinue their use.

---

[20]     Harriet Ryan et al., *OxyContin goes global – "We're only just getting started,"* L.A. Times (Dec. 18, 2016), http://www.latimes.com/projects/la-me-oxycontin-part3/ (hereinafter, "Ryan, *OxyContin goes global*").

12.    The prevailing and accurate understanding of the enormous risks and limited benefits of long-term opioid use constrained drug manufacturers' ability to drive sales.  In order to decrease reasonable concerns about opioids and to maximize profits, the Sackler Defendants engaged in a concerted, coordinated strategy through Purdue and Rhodes to shift the way in which doctors and patients think about pain and, specifically, to encourage the use of opioids to treat not just the relative few who suffer from acute post-surgical pain and end-stage cancer pain, but the masses who suffer from common chronic pain conditions.

13.    Borrowing from the tobacco industry's playbook, Purdue and the Sackler Defendants employed ingenious marketing strategies, as detailed further herein, designed to "reeducate" the public and prescribers.  Purdue and the Sackler Defendants deliberately conceived these strategies to create, and in fact did create, an entirely new "health care" narrative—one in which opioids are considered safe and effective for long-term use, and pain is aggressively treated at all costs.  According to this newly fabricated narrative, pain was seriously under-treated throughout the United States because opioids were under-prescribed, and doctors came under enormous pressure to treat all kinds of pain with opioids.

14.    Purdue and the Sackler Defendants' intention was to normalize aggressive prescribing of opioids for various kinds of pain by downplaying the very real risks of opioids, especially the risk of addiction, and by exaggerating the benefits of use.  To accomplish this goal, they intentionally misled doctors and patients about the appropriate uses, risks, safety and efficacy of prescription opioids.  They did so directly through sales representatives and marketing materials and indirectly through financial relationships with academic physicians, professional societies, hospitals, trade associations for state medical boards and seemingly neutral third-party foundations.

15.    Purdue assured the public and prescribers that the risk of becoming addicted to prescription opioids among patients being treated for pain was less than 1%.  In reality, many

people with no addiction history can become addicted after just weeks or even days of use.[21] According to estimates, as many as 56% of patients receiving long-term prescription opioid painkillers become addicted.[22]   Indeed, almost one in five people who receive an opioid prescription with ten days' supply will still be taking opioids one year later.[23]

16.     Put simply, Purdue and the Sackler Defendants manipulated and misrepresented medical science to serve their own agenda at great human cost.  Indeed, in a study published on March 6, 2018 in the *Journal of the American Medical Association* ("*JAMA*"),[24] researchers who conducted the first randomized clinical trial designed to compare the efficacy of opioids and non-opioids (including acetaminophen, ibuprofen and lidocaine) for the treatment of moderate to severe back pain, hip pain or knee osteoarthritis pain concluded that patients who took opioids over the long term experienced improvements in pain-related function no better than patients who used safer alternatives.

17.     Defendants wholly failed to meet their obligation to timely report and put a halt to these and other suspicious sales, fueling the flood of pills into each Plaintiff's jurisdictions.

18.     Defendants' scheme was tremendously successful, if measured by profit.—The Sackler family, which owns Purdue—a privately held company—is listed on *Fortune*'s list of America's wealthiest families; its "ruthless marketing of painkillers has generated billions of dollars—and millions of addicts."[25] The Sackler family wealth is estimated at $13 billion.

19.     The impact of opioid addiction has devastated the nation, emerging as one of the country's major health threats.  Former FDA Commissioner David A. Kessler has called the

---

[21]   Anna Lembke, *Drug Dealer, MD: How Doctors Were Duped, Patients Got Hooked, and Why It's So Hard to Stop* 22 (Johns Hopkins University Press 2016) (hereinafter, "Lembke (2016)").

[22]   Bridget A. Martell et al., *Systematic Review: Opioid Treatment for Chronic Back Pain: Prevalence, Efficacy, and Association with Addiction*, 146(2) Ann. Intern. Med. 116-27 (2007), http://annals.org/aim/article/732048/systematic-review-opioid-treatment-chronic-back-pain-prevalence-efficacy-association (hereinafter, "Martell, *Systematic Review*").

[23]   Sarah Frostenson, *The risk of a single 5-day opioid prescription, in one chart*, Vox (Mar. 18, 20107, 7:30 AM), www.vox.com/2017/3/18/14954626/one-simple-way-to-curb-opioid-overuse-prescribe-them-for-3-days-or-less.

[24]   Erin E. Krebs et al., *Effect of Opioid vs. Nonopioid Medications on Pain-Related Function in Patients with Chronic Back Pain or Hip or Knee Osteoarthritis Pain, The SPACE Randomized Clinical Trial*, 319(9) JAMA 872-82 (2018) (hereinafter, "Krebs, *Effect of Opioid vs. Nonopioid Medications*").

[25]   Keefe, *Empire of Pain*, *supra* note 15.

failure to recognize the dangers of painkillers "one of the greatest mistakes of modern medicine." As alleged herein, that "mistake" resulted in large part from defendants' false and misleading messaging, which was carefully calculated to reach as many prescribers as possible, as well as defendants' willingness to turn a blind eye to suspicious orders.

20.     Even though Purdue had previously been forced to admit the unlawful marketing and sale of opioids, the Sacklers Defendants continued to direct deceptive marketing strategies and turn a blind eye to suspicious orders.  The profits realized by the aggressive marketing and prescribing of opioids dwarf the penalties imposed as a result of violations found.  Thus, the incentive to push opioids remains.  The scheme was so financially successful, in fact, that despite the clear and obvious devastation it caused at home the Sackler Defendants continue to pursue the same strategy abroad.  As reported by the *Los Angeles Times* in 2016, Purdue stated "[w]e're only just getting started," and intends to "[p]ut the painkiller that set off the United States opioid crisis into medicine cabinets around the world."[26]

21.     As discussed in detail below, the Sackler Defendants orchestrated the growth of the prescription opioid market through deceptive and untruthful marketing tactics pioneered by Arthur Sackler. Not only did the Sackler Defendants create and aggressively market opioids for general and ubiquitous use, but the Sackler Defendants knew about the dangers of prescription opioids and pushed to increase sales despite the devastating consequences of the public health crisis.

## II.     PARTIES

22.     Plaintiffs, Baldwin County, AL; Bibb County, AL; Bullock County, AL; Cherokee County, AL; Chilton County, AL; City of Clanton, AL; Coffee County, AL; Conecuh County, AL; Cullman County, AL; Dallas County, AL; City of Cullman, AL; City of Decatur, AL; City of Demopolis, AL; Town of Double Springs, AL; City of Enterprise, AL; Etowah/Gadsden, et al., AL; City of Fort Payne, AL; Greene County, AL; City of Guin, AL; City of Hamilton, AL;

---

[26]     Ryan, *OxyContin goes global*, *supra* note 20.

City of Hartselle, AL; Lawrence County, AL; Lowndes County, AL; Madison County, AL; Marengo County, AL; City of Marion, AL; City of Mobile, AL; Mobile County, AL; Morgan County, AL; City of Moulton, AL; City of Opp, AL; City of Ozark, AL; City of Phenix City, AL; Pike County, AL; City of Selma, AL; Sumter County, AL; Tallapoosa County, AL; City of Troy, AL; Tuscaloosa County, AL; City of Union Springs, AL; Washington County, AL; and Wilcox County, AL, are political subdivisions of the state of Alabama which have the power to sue in their own name and bring the claims set forth in this Complaint.

23.    Plaintiffs, Amador County, CA, acting by and through the County Counsel; Butte County, CA, acting by and through the County Counsel; Calaveras County, CA, acting by and through the County Counsel; Contra Costa County, CA, acting by and through the County Counsel; Del Norte County, CA, acting by and through the County Counsel; El Dorado County, CA, acting by and through the County Counsel; Fresno County, CA, acting by and through the County Counsel; Glenn County, CA, acting by and through the County Counsel; Imperial County, CA, acting by and through the County Counsel; Inyo County, CA, acting by and through the County Counsel; Lassen County, CA, acting by and through the County Counsel; Madera County, CA, acting by and through the County Counsel; Mariposa County, CA, acting by and through the County Counsel; Mendocino County, CA, acting by and through the County Counsel; Merced County, CA, acting by and through the County Counsel; Modoc County, CA, acting by and through the County Counsel; Mono County, CA, acting by and through the County Counsel; Monterey County, CA, acting by and through the County Counsel; Nevada County, CA, acting by and through the County Counsel; Placer County, CA, acting by and through the County Counsel; Plumas County, CA, acting by and through the County Counsel; Sacramento County, CA, acting by and through the County Counsel; San Benito County, CA, acting by and through the County Counsel; San Diego County, CA, acting by and through the County Counsel; Shasta County, CA, acting by and through the County Counsel; Siskiyou County, CA, acting by and through the County Counsel; Sutter County, CA, acting by and through the County Counsel; Tehama County, CA, acting by and through the County Counsel; Trinity County, CA, acting by

and through the County Counsel; Tuolumne County, CA, acting by and through the County Counsel; Yolo County, CA, acting by and through the County Counsel; and Yuba County, CA, acting by and through the County Counsel, are political subdivisions of the state of California which have the power to sue in their own name and bring the claims set forth in this Complaint.

24.     Plaintiffs, Bay County, FL; City of Bradenton, FL; Calhoun County, FL; Escambia County, FL; Gulf County, FL; Hernando County, FL; Holmes County, FL; Jackson County, FL; Leon County, FL; City of Miami Gardens, FL; Miami-Dade County, FL; City of North Miami, FL; City of Panama City, FL; Pasco County, FL; City of Pensacola, FL; Pinellas County, FL; City of Pinellas Park, FL; Santa Rosa County, FL; City of St. Petersburg, FL; City of Tallahassee, FL; and Volusia County, FL, are political subdivisions of the state of Florida which have the power to sue in their own name and bring the claims set forth in this Complaint.

25.     Plaintiffs, City of Albany, GA; City of Augusta, GA; Bartow County, GA; City of Columbus, GA; Laurens County, GA; Lee County, GA; Monroe County, GA; Polk County, GA; Union County, GA; and Wilkinson County, GA, are political subdivisions of the state of Georgia which have the power to sue in their own name and bring the claims set forth in this Complaint.

26.     Plaintiffs, Alexander County, by and through the State's Attorney of Alexander County, IL; Bond County, by and through the State's Attorney of Bond County, IL; Calhoun County, by and through the State's Attorney of Calhoun County, IL; Christian County, by and through the State's Attorney of Christian County, IL; Coles County, by and through the State's Attorney of Coles County, IL; Edwards County, by and through the State's Attorney of Edwards County, IL; Effingham County, by and through the State's Attorney of Effingham County, IL; Gallatin County, by and through the State's Attorney of Gallatin County, IL; Hamilton County, by and through the State's Attorney of Hamilton County, IL; Hardin County, by and through the State's Attorney of Hardin County, IL; Jasper County, by and through the State's Attorney of Jasper County, IL; Jefferson County, by and through the State's Attorney of Jefferson County, IL; Johnson County, by and through the State's Attorney of Johnson County, IL; Lawrence County, by and through the State's Attorney of Lawrence County, IL; Lee County, by and through the

10

State's Attorney of Lee County, IL; Livingston County, by and through the State's Attorney of Livingston County, IL; Marion County, by and through the State's Attorney of Marion County, IL; Massac County, by and through the State's Attorney of Massac County, IL; City of Metropolis, a Municipal Corporation, IL; Pulaski County, by and through the State's Attorney of Pulaski County, IL; City of Rockford, a Municipal Corporation, IL; Saline County, by and through the State's Attorney of Saline County, IL; Schuyler County, by and through the State's Attorney of Schuyler County, IL; Shelby County, by and through the State's Attorney of Shelby County, IL; Wabash County, by and through the State's Attorney of Wabash County, IL; Washington County, by and through the State's Attorney of Washington County, IL; White County, by and through the State's Attorney of White County, IL; and Winnebago County, by and through the State's Attorney of Winnebago County, IL, are political subdivisions of the state of Illinois which have the power to sue in their own name and bring the claims set forth in this Complaint.

27.     Plaintiffs, Town of Atlanta, IN; City of Beech Grove, IN; Blackford County, IN; Town of Brownstown, IN; Town of Chandler, IN; City of Evansville, IN; City of Fishers, IN; City of Fort Wayne, IN; City of Greenwood, IN; Harrison County, IN; City of Hartford, IN; Howard County, IN; City of Huntington, IN; Jackson County, IN; City of Jasper, IN; City of Jeffersonville, IN; City of Kokomo, IN; City of Lawrence, IN; City of Martinsville, IN; City of Montpelier, IN; Town of Mooresville, IN; City of Muncie, IN; City of New Albany, IN; City of Noblesville, IN; City of Peru, IN; Town of Plainfield, IN; City of Seymour, IN; City of Shelbyville, IN; Town of Sheridan, IN; City of South Bend, IN; Starke County, IN; City of Terre Haute, IN; Tippecanoe County, IN; Town of Upland, IN; Vigo County, IN; City of Westfield, IN; and Town of Zionsville, IN, are political subdivisions of the state of Indiana which have the power to sue in their own name and bring the claims set forth in this Complaint.

28.     Plaintiffs, Board of Commissioners of Cherokee County, KS; Board of Commissioners of Cowley County, KS; Board of Commissioners of Pratt County, KS; Board of Commissioners of Sedgwick County, KS, are political subdivisions of the state of Kansas which have the power to sue in their own name and bring the claims set forth in this Complaint.

11

29.     Plaintiffs, The Fiscal Court of Allen County, on behalf of Allen County, KY; The Fiscal Court of Anderson County, on behalf of Anderson County, KY; The Fiscal Court of Bell County, on behalf of Bell County, KY; The Fiscal Court of Boone County, on behalf of Boone County, KY; The Fiscal Court of Boyd County, on behalf of Boyd County, KY; The Fiscal Court of Boyle County, on behalf of Boyle County, KY; The Fiscal Court of Bracken County, on behalf of Bracken County, KY; The Fiscal Court of Bullitt County, on behalf of Bullitt County, KY; The Fiscal Court of Campbell County, on behalf of Campbell County, KY; The Fiscal Court of Carlisle County, on behalf of Carlisle County, KY; The Fiscal Court of Carter County, on behalf of Carter County, KY; The Fiscal Court of Christian County, on behalf of Christian County, KY; The Fiscal Court of Clark County, on behalf of Clark County, KY; The Fiscal Court of Clay County, on behalf of Clay County, KY; The Fiscal Court of Cumberland County, on behalf of Cumberland County, KY; The Fiscal Court of Elliott County, on behalf of Elliott County, KY; The Fiscal Court of Fleming County, on behalf of Fleming County, KY; The Fiscal Court of Franklin County, on behalf of Franklin County, KY; The Fiscal Court of Garrard County, on behalf of Garrard County, KY; The Fiscal Court of Greenup County, on behalf of Greenup County, KY; The Fiscal Court of Harlan County, on behalf of Harlan County, KY; The Fiscal Court of Henderson County, on behalf of Henderson County, KY; The Fiscal Court of Henry County, on behalf of Henry County, KY; The Fiscal Court of Hopkins County, on behalf of Hopkins County, KY; The Fiscal Court of Jessamine County, on behalf of Jessamine County, KY; The Fiscal Court of Kenton County, on behalf of Kenton County, KY; The Fiscal Court of Knox County, on behalf of Knox County, KY; The Fiscal Court of Laurel County, on behalf of Laurel County, KY; The Fiscal Court of Leslie County, on behalf of Leslie County, KY; The Fiscal Court of Letcher County, on behalf of Letcher County, KY; Lexington-Fayette Urban County Government, KY; The Fiscal Court of Lincoln County, on behalf of Lincoln County, KY; City of Louisville/ Jefferson Metro Government, KY; The Fiscal Court of Madison County, on behalf of Madison County, KY; The Fiscal Court of Marshall County, on behalf of Marshall County, KY; The Fiscal Court of Martin County, on behalf of Martin County, KY; The Fiscal

Court of Montgomery County, on behalf of Montgomery County, KY; The Fiscal Court of Nicholas County, on behalf of Nicholas County, KY; The Fiscal Court of Oldham County, on behalf of Oldham County, KY; The Fiscal Court of Pendleton County, on behalf of Pendleton County, KY; The Fiscal Court of Perry County, on behalf of Perry County, KY; The Fiscal Court of Powell County, on behalf of Powell County, KY; The Fiscal Court of Pulaski County, on behalf of Pulaski County, KY; The Fiscal Court of Rowan County, on behalf of Rowan County, KY; The Fiscal Court of Scott County, on behalf of Scott County, KY; The Fiscal Court of Shelby County, on behalf of Shelby County, KY; The Fiscal Court of Spencer County, on behalf of Spencer County, KY; The Fiscal Court of Union County, on behalf of Union County, KY; The Fiscal Court of Wayne County, on behalf of Wayne County, KY; The Fiscal Court of Whitley County, on behalf of Whitley County, KY; and The Fiscal Court of Woodford County, on behalf of Woodford County, KY, are political subdivisions of the state of Kentucky which have the power to sue in their own name and bring the claims set forth in this Complaint.

30.     Plaintiffs, City of Baton Rouge, Parish of East Baton Rouge, LA; City of Saint Martinville, LA; and Parish of St. John the Baptist, LA, are political subdivisions of the state of Louisiana which have the power to sue in their own name and bring the claims set forth in this Complaint.

31.     Plaintiffs, Allegany County, MD; Cecil County, MD; City of Cumberland, MD; City of Frostburg, MD; City of Hagerstown, MD; St. Mary's County, MD; and Washington County, MD, are political subdivisions of the state of Maryland which have the power to sue in their own name and bring the claims set forth in this Complaint.

32.     Plaintiffs, Town of Acushnet, MA; City of Agawam, MA; City of Amesbury, MA; Town of Aquinnah, MA; Town of Athol, MA; Town of Auburn, MA; Town of Barnstable, MA; Town of Belchertown, MA; City of Beverly, MA; Town of Billerica, MA; Town of Brewster, MA; Town of Bridgewater, MA; City of Brockton, MA; Town of Brookline, MA; Town of Carver, MA; Town of Charlton, MA; Town of Chelmsford, MA; City of Chelsea, MA; Town of Clarksburg, MA; Town of Danvers, MA; Town of Dedham, MA; Town of Dennis, MA; Town of

Douglas, MA; Town of Dudley, MA; Town of East Bridgewater, MA; Town of Eastham, MA; City of Easthampton, MA; City of Everett, MA; Town of Fairhaven, MA; Town of Falmouth, MA; Town of Franklin, MA; Town of Freetown, MA; Town of Georgetown, MA; Town of Grafton, MA; City of Greenfield, MA; Town of Hanson, MA; Town of Holliston, MA; City of Holyoke, MA; Town of Hopedale, MA; Town of Kingston, MA; Town of Lakeville, MA; Town of Leicester, MA; City of Leominster, MA; Town of Leverett, MA; Town of Longmeadow, MA; City of Lowell, MA; Town of Ludlow, MA; Town of Lunenburg, MA; City of Lynn, MA; City of Malden, MA; Town of Marblehead, MA; Town of Marshfield, MA; Town of Mashpee, MA; Town of Mattapoisett, MA; City of Melrose, MA; City of Methuen, MA; Town of Middleborough, MA; Town of Milford, MA; Town Millbury, MA; Town of Nantucket, MA; City of Newburyport, MA; City of North Adams, MA; Town of North Andover, MA; Town of North Attleborough, MA; Town of North Reading, MA; City of Northampton, MA; Town of Northbridge, MA; Town of Norton, MA; Town of Norwell, MA; Town of Norwood, MA; Town of Orange, MA; Town of Palmer, MA; City of Peabody, MA; Town of Pembroke, MA; City of Pittsfield, MA; Town of Plainville, MA; Town of Plymouth, MA; Town of Provincetown, MA; Town of Rehoboth, MA; City of Revere, MA; Town of Rockland, MA; Town of Salisbury, MA; Town of Sandwich, MA; Town of Scituate, MA; Town of Seekonk, MA; Town of Sheffield, MA; Town of Shirley, MA; Town of Somerset, MA; Town of South Hadley, MA; Town of Southbridge, MA; Town of Spencer, MA; Town of Stoneham, MA; Town of Stoughton, MA; Town of Sturbridge, MA; Town of Sudbury, MA; Town of Sutton, MA; Town of Swampscott, MA; Town of Templeton, MA; Town of Tewksbury, MA; Town of Truro, MA; Town of Tyngsborough, MA; Town of Upton, MA; Town of Walpole, MA; Town of Ware, MA; Town of Warren, MA; Town of Watertown, MA; Town of West Boylston, MA; Town of West Bridgewater, MA; Town of West Springfield, MA; Town of West Tisbury, MA; Town of Westborough, MA; Town of Westford, MA; Town of Williamsburg, MA; Town of Wilmington, MA; Town of Winchendon, MA; Town of Winthrop, MA; and City of Woburn, MA, are political

14

subdivisions of the state of Massachusetts which have the power to sue in their own name and bring the claims set forth in this Complaint.

33.     Plaintiffs, Branch County, MI; Charter Township of Canton, MI; Charter Township of Clinton, MI; Eaton County, MI; Charter Township of Huron, MI; City of Livonia, MI; Muskegon County, MI; Charter Township of Northville, MI; City of Romulus, MI; Charter Township of Van Buren, MI; and City of Wayne, MI, are political subdivisions of the state of Michigan which have the power to sue in their own name and bring the claims set forth in this Complaint.

34.     Plaintiffs, Adams County, MS; Amite County, MS; City of Amory, MS; Benton County, MS; City of Charleston, MS; City of Columbia, MS; Forrest County, MS; Franklin County, MS; City of Greenwood, MS; City of Hattiesburg, MS; Holmes County, MS; Itawamba County, MS; City of Iuka, MS; Jefferson County, MS; Jefferson Davis County, MS; City of Laurel, MS; Lafayette County, MS; Lawrence County, MS; County of Leflore, MS; Lincoln County, MS; Marion County, MS; Marshall County, MS; City of Meridian, MS; Monroe County, MS; Neshoba County, MS; City of New Albany, MS; County of Pearl River, MS; Perry County, MS; Prentiss County, MS; Stone County, MS; Tallahatchie County, MS; Tippah County, MS; Union County, MS; Walthall County, MS; and City of Wiggins, MS, are political subdivisions of the state of Mississippi which have the power to sue in their own name and bring the claims set forth in this Complaint.

35.     Plaintiffs, Audrain County, MO; Cole County, MO; Gasconade County, MO; Lewis County, MO; Maries County, MO; Miller County, MO; Moniteau County, MO; Montgomery County, MO; Osage County, MO; Ozark County, MO; Phelps County, MO; Pulaski County, MO; Randolph County, MO; Reynolds County, MO; Ripley County, MO; Shannon County, MO; Shelby County, MO; Warren County, MO; and Webster County, MO, are political subdivisions of the state of Missouri which have the power to sue in their own name and bring the claims set forth in this Complaint.

36.     Plaintiff Sarpy County, NE and City of South Sioux City, NE, are political subdivisions of the state of Nebraska and has the power to sue in its own name and bring the claims set forth in this Complaint.

37.     Plaintiff Nye County, NV, is political subdivisions of the state of Nevada and has the power to sue in its own name and bring the claims set forth in this Complaint.

38.     Plaintiffs, Town of Derry, NH; City of Franklin, NH; City of Laconia, NH; and Town of Londonderry, NH, are political subdivisions of the state of New Hampshire which have the power to sue in their own name and bring the claims set forth in this Complaint.

39.     Plaintiffs, Board of Commissioners of the County of Bernalillo County, NM; Board of Commissioners of the County of Doña Ana, NM; Board of Commissioners of the County of Lea County, NM; Board of County Commissioners of the County of McKinley, NM; Board of Commissioners of the County of Otero County, NM; Board of Commissioners of the County of Taos County, NM; Board of Commissioners of the County of Socorro, NM; Board of Commissioners of the County of Curry, NM; Board of Commissioners of the County of Valencia, NM; Board of Commissioners of the County of Sierra, NM; Board of Commissioners of the County of Catron, NM; and Board of Commissioners of the County of Cibola, NM, are political subdivisions of the state of New Mexico which have the power to sue in their own name and bring the claims set forth in this Complaint.

40.     Plaintiffs, Alexander County, NC; Alleghany County, NC; Anson County, NC; Ashe County, NC; Beaufort County, NC; Brunswick County, NC; Buncombe County, NC; Burke County, NC; Caldwell County, NC; Camden County, NC; Carteret County, NC; Caswell County, NC; Catawba County, NC; Cherokee County, NC; Chowan County, NC; Columbus County, NC; Craven County, NC; Cumberland County, NC; Currituck County, NC; Dare County, NC; Davie County, NC; Duplin County, NC; City of Fayetteville, NC; Forsyth County, NC; Franklin County, NC; Gaston County, NC; Greene County, NC; Halifax County, NC; Haywood County, NC; City of Henderson, NC; City of Hickory, NC; City of Jacksonville, NC; Jones County, NC; Lenoir County, NC; Lincoln County, NC; Madison County, NC; Martin County, NC; McDowell

County, NC; Moore County, NC; New Hanover County, NC; Onslow County, NC; Orange County, NC; Pamlico County, NC; Pasquotank County, NC; Person County, NC; Pitt County, NC; Polk County, NC; Randolph County, NC; Richmond County, NC; Rockingham County, NC; Rowan County, NC; Rutherford County, NC; Stokes County, NC; Surry County, NC; Tyrrell County, NC; Vance County, NC; Warren County, NC; Washington County, NC; Watauga County, NC; Wayne County, NC; Wilkes County, NC; City of Wilmington, NC; City of Winston-Salem, NC; Yadkin County, NC; and Yancey County, NC, are political subdivisions of the state of North Carolina which have the power to sue in their own name and bring the claims set forth in this Complaint.

41. Plaintiffs, Adams County Board of Commissioners, OH; City of Ashland, OH; Ashland County Board of Commissioners, OH; Athens County Board of Commissioners, OH; Auglaize County Board of Commissioners, OH; Belmont County Board of Commissioners, OH; Brown County Board of Commissioners, OH; Carroll County Board of Commissioners, OH; Champaign County Board of Commissioners, OH; City of Cincinnati, OH; Clermont County Board of Commissioners, OH; City of Cleveland, OH; Columbiana County Board of Commissioners, OH; Coshocton County Board of Commissioners, OH; Crawford County Board of Commissioners, OH; Darke County Board of Commissioners, OH; Delaware County Board of Commissioners, OH; Erie County Board of Commissioners, OH; Fairfield County Board of Commissioners, OH; Franklin County Board of Commissioners, OH; Gallia County Board of Commissioners, OH; Geauga County Board of Commissioners, OH; Guernsey County Board of Commissioners, OH; City of Hamilton, OH; Hamilton County Board of Commissioners, OH; Hocking County Board of Commissioners, OH; Huron County Board of Commissioners, OH; City of Ironton, OH; Jackson County Board of Commissioners, OH; Knox County Board of Commissioners, OH; Lawrence County Board of Commissioners, OH; City of Lebanon, OH; Licking County Board of Commissioners, OH; Logan County Board of Commissioners, OH; Marion County Board of Commissioners, OH; Mercer County Board of Commissioners, OH; Monroe County Board of Commissioners, OH; Morrow County Board of Commissioners, OH;

Muskingum County Board of Commissioners, OH; Ottawa County Board of Commissioners, OH; Perry County Board of Commissioners, OH; Pike County Board of Commissioners, OH; City of Portsmouth, OH; Ross County Board of Commissioners, OH; Scioto County Board of Commissioners, OH; Seneca County Board of Commissioners, OH; Shelby County Board of Commissioners, OH; Vinton County Board of Commissioners, OH; Wayne County Board of Commissioners, OH; Williams County Board of Commissioners, OH; and Wyandot County Board of Commissioners, OH, are political subdivisions of the state of Ohio which have the power to sue in their own name and bring the claims set forth in this Complaint.

42.     Plaintiff, City of Portland, OR, is a political subdivision of the state of Oregon which has the power to sue in its own name and bring the claims set forth in this Complaint.

43.     Plaintiffs, Columbia County, PA; Fairview Township, PA; Indiana County, PA; Luzerne County, PA; City of Nanticoke, PA; Plains Township, PA; City of Wilkes-Barre, PA; Wyoming County, PA, are political subdivisions of the commonwealth of Pennsylvania which have the power to sue in their own name and bring the claims set forth in this Complaint.

44.     Plaintiffs, Town of Barrington, RI; Town of Bristol, RI; Town of Burrillville, RI; City of Central Falls, RI; Town of Charlestown, RI; Town of Coventry, RI; City of Cranston, RI; Town of Cumberland, RI; Town of East Greenwich, RI; City of East Providence, RI; Town of Foster, RI; Town of Glocester, RI; Town of Hopkinton, RI; Town of Jamestown, RI; Town of Johnston, RI; Town of Middletown, RI; Town of Narragansett, RI; City of Newport, RI; Town of North Kingstown, RI; Town of North Providence, RI; City of Pawtucket, RI; Town of Richmond, RI; Town of Scituate, RI; Town of Smithfield, RI; Town of South Kingstown, RI; City of Warwick, RI; Town of West Greenwich, RI; Town of Warren, RI; Town of West Warwick, RI; Town of Westerly, RI; and City of Woonsocket, RI, are political subdivisions of the state of Rhode Island which have the power to sue in their own name and bring the claims set forth in this Complaint.

45.     Plaintiffs, Campbell County, TN; Crockett County, TN; Fentress County, TN; Greene County, TN; Hancock County, TN; Hawkins County, TN; Haywood County, TN;

Henderson County, TN; Johnson County, TN; Lauderdale County, TN; City of Lexington, TN; Madison County, TN; Montgomery County, TN; Overton County, TN; Pickett County, TN; Washington County, TN; and Williamson County, TN, are political subdivisions of the state of Tennessee which have the power to sue in their own name and bring the claims set forth in this Complaint.

46.     Plaintiffs, Carbon County, UT; and Utah County, UT, are political subdivisions of the state of Utah which have the power to sue in their own name and bring the claims set forth in this Complaint.

47.     Plaintiffs, City of Danville, VA; City of Richmond, VA; Scott County Board of Supervisors, VA; and City of Virginia Beach and the Sheriff of the City of Virginia Beach, VA, are political subdivisions of the state of Virginia which have the power to sue in their own name and bring the claims set forth in this Complaint.

48.     Plaintiffs, Boone County Commission, WV; Fayette County Commission, WV; Greenbrier County Commission, WV; Kanawha County Commission, WV; Logan County Commission, WV; City of Vienna, WV; and Wayne County Commission, WV, are political subdivisions of the state of West Virginia which have the power to sue in their own name and bring the claims set forth in this Complaint.

49.     Plaintiffs, Dane County, WI; Milwaukee County, WI; Walworth County, WI; and Waukesha County, WI, are political subdivisions of the state of Wisconsin which have the power to sue in their own name and bring the claims set forth in this Complaint.

50.     Plaintiffs, Eastern Band of Cherokee Indians; Oneida Nation; Red Lake Band of Chippewa Indians; Seneca Nation Tribe; Lower Brule/Sioux Tribe; Tule River Tribe of California; White Earth Tribe of Minnesota Chippewa; and The Blackfeet Tribe of the Blackfeet Indian Reservation, are sovereign, federally recognized Native American Nations which have the power to sue in their own name and bring the claims set forth in this Complaint.

51.     Defendant Rhodes Pharmaceuticals L.P. ("Rhodes") is a Delaware limited partnership formed in or around 2007 with headquarters located in Coventry, Rhode Island.

52.     Defendant Richard S. Sackler is a natural person residing in Travis County, Texas. He has served as a member of the Board of Directors of Purdue and Purdue-related entities since the 1990s.

53.     Defendant Jonathan D. Sackler is a natural person residing in Fairfield County, Connecticut.  He has served as a member of the Board of Directors of Purdue and Purdue-related entities since the 1990s.

54.     Defendant Mortimer D.A. Sackler is a natural person residing in New York County, New York.  He has served as a member of the Board of Directors of Purdue and Purdue-related entities since the 1990s.

55.     Defendant Kathe A. Sackler is a natural person residing in Fairfield County, Connecticut.  She has served as a member of the Board of Directors of Purdue and Purdue-related entities since the 1990s.

56.     Defendant Ilene Sackler Lefcourt is a natural person residing in New York County, New York.  She has served as a member of the Board of Directors of Purdue and Purdue-related entities since the 1990s.

57.     Defendant Beverly Sackler is a natural person residing in Fairfield County, Connecticut.  She has served as a member of the Board of Directors of Purdue and Purdue-related entities since the 1990s.

58.     Defendant Theresa Sackler is a natural person residing in New York County, New York.  She has served as a member of the Board of Directors of Purdue and Purdue-related entities since the 1990s.

59.     Defendant David A. Sackler is a natural person residing in New York County, New York.  He has served as a member of the Board of Directors of Purdue and Purdue-related entities since 2012.

60.     Defendant Trust for the Benefit of Members of the Raymond Sackler Family (the "Raymond Sackler Trust") is a trust for which Defendants Beverly Sackler, Richard S. Sackler and/or Jonathan D. Sackler are trustees.  It is the 50% direct or indirect beneficial owner of Purdue

and the Purdue-related entities and the recipient of 50% of the profits from the sale of opioids by Purdue and Purdue-related entities.  Collectively, the defendants listed in ¶¶52-60 are referred to as the "Sackler Defendants" or "Sackler Families."

## III.    JURISDICTION AND VENUE

61.    Jurisdiction is proper in this Court under 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which members of the class of plaintiffs are citizens of states different from Defendants. Further, greater than two-thirds of the members of the Class reside in states other than the states in which Defendants are citizens.

62.    This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, raise a federal question. This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331, 1961, 1962 and 1964. This Court has personal jurisdiction over Defendants under 18 U.S.C. § 1965. This action is brought under 18 U.S.C. § 1964, and the ends of justice requires that any defendants not residing in this district be brought before this Court.

63.    In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all of the claims are derived from a common nucleus of operative facts and are such that Plaintiffs ordinarily would expect to try them in one judicial proceeding. This Court has supplemental jurisdiction over  the Plaintiffs' state-law claims under 28 U.S.C. § 1367 because those claims are so related to the RICO claim as to form part of the same case or controversy.

64.    This Court has personal jurisdiction over all Defendants under R.C. 2307.382 because the causes of action alleged in this Complaint arise out of each Defendants'  transacting business in New York, contracting to supply services or goods in this state, causing tortious injury by an act or omission in this state, and because the Defendants regularly do or solicit business or engage in a persistent course of conduct or deriving substantial revenue from goods used

or consumed or services rendered in this state. Defendants have purposefully directed their actions towards New York and/or have the requisite minimum contacts with New York to satisfy any statutory or constitutional requirements for personal jurisdiction.

65.    Venue is proper under 18 U.S.C. § 1965(a) because multiple Defendants reside, are found, have agents, or transact their affairs in the Southern District of New York. Venue is also proper in this district pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claim occurred in this District.

## IV.    FACTUAL ALLEGATIONS

### A.    Purdue's False Marketing Tactics Created an Overwhelming Demand for Prescription Opioid and Purdue's Failure to Report Known Over-Proscribing Doctors Supported the Explosive Market Growth of Opioids

#### 1.    The Defendants' Multi-Pronged Scheme to Change Prescriber Habits and Public Perception and Increase Demand for Opioids

66.    In order to accomplish the fundamental shift in perception that was key to successfully marketing their opioids, the Sackler Defendants, by and through Purdue, designed and implemented a sophisticated and deceptive marketing strategy. Lacking legitimate scientific research to support their claims, the Sackler Defendants turned to the marketing techniques first pioneered by Arthur Sackler to create a series of misperceptions in the medical community and ultimately reverse the long-settled understanding of the relative risks and benefits of opioids.

67.    The Sackler Defendants promoted, and profited from, their misrepresentations about the risks and benefits of opioids for chronic pain even though they knew that their marketing was false and misleading. The history of opioids, as well as research and clinical experience over the last 20 years, established that opioids were highly addictive and responsible for a long list of very serious adverse outcomes. The FDA and other regulators warned Purdue of these risks. The Sackler Defendants had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and deaths—all of which made

clear the harms from long-term opioid use and that patients are suffering from addiction, overdoses, and death in alarming numbers. More recently, the FDA and CDC issued pronouncements based on existing medical evidence that conclusively expose the known falsity of these Defendants' misrepresentations.

68.     The marketing scheme to increase opioid prescriptions centered around nine categories of misrepresentations, which are discussed in detail below. The Sackler Defendants, and Purdue disseminated these misrepresentations through various channels, including through advertising, sales representatives, purportedly independent organizations these defendants funded and controlled, "Front Groups," so-called industry "Key Opinion Leaders," and Continuing Medical Education ("CME") programs discussed subsequently below.

<div align="center">

**a.     The Sackler Defendants, and Purdue Promoted
Multiple Falsehoods About Opioids**

</div>

69.     The Sackler Defendants, and Purdue's misrepresentations fall into the following nine categories:

(a)     The risk of addiction from chronic opioid therapy is low

(b)     To the extent there is a risk of addiction, it can be easily identified and managed

(c)     Signs of addictive behavior are "pseudoaddiction," requiring more opioids

(d)     Opioid withdrawal can be avoided by tapering

(e)     Opioid doses can be increased without limit or greater risks

(f)     Long-term opioid use improves functioning

(g)     Alternative forms of pain relief pose greater risks than opioids

(h)     OxyContin provides twelve hours of pain relief

(i)     New formulations of certain opioids successfully deter abuse

70.     Each of these propositions was false. The Sackler Defendants, and Purdue knew this, but they nonetheless set out to convince physicians, patients, and the public at large of the truth of each of these propositions in order to expand the market for their opioids.

71.     The categories of misrepresentations are offered to organize the numerous statements the Sackler Defendants designed and Purdue made and to explain their role in the overall marketing effort.  While this Complaint endeavors to document examples of each misrepresentation and the manner in which they were disseminated, they are just that—examples. The Complaint is not an exhaustive catalog of the nature and manner of each deceptive statement made by Purdue or directed by the Sackler Defendants.

### (1)     Falsehood #1: The risk of addiction from chronic opioid therapy is low

72.     Central to the Sackler Defendants, and Purdue's promotional scheme was the misrepresentation that opioids are rarely addictive when taken for chronic pain.  Through their marketing efforts, the Sackler Defendants, and Purdue advanced the idea that the risk of addiction is low when opioids are taken as prescribed by "legitimate" pain patients. That, in turn, directly led  to the expected and intended result that doctors prescribed more opioids to more patients—thereby enriching the Sackler Defendants, and Purdue and substantially contributing to the opioid epidemic.

73.     Purdue, at the Direction of the Sackler Defendants claimed that the potential for addiction from its opioids was relatively small or non-existent, even though there was no scientific evidence to support those claims.

74.     In fact, studies have shown that a substantial percentage of long-term users of opioids experience addiction. Addiction can result from the use of any opioid, "even  at recommended dose,"[27] and the risk substantially increases with more than three months of use.[28]

---

[27] *FDA Announces Safety Labeling Changes and Postmarket Study Requirements for Extended- Release and Long-Acting Opioid Analgesics*, MagMutual (Aug. 18, 2016), https://www.magmutual.com/learning/article/fda-announces-safety-laveling-changes-and- postmarket-study-requirements-opioids; *see also* Press Release, U.S. Food & Drug Admin., FDA Announces Enhanced Warnings for Immediate-Release Opioid Pain Medications Related to Risks of Misuse, Abuse, Addiction, Overdose and Death, (Mar. 22, 2016), https://www.fda.gov/News Events/Newsroom/PressAnnouncements/ucm491739.htm.
[28] Deborah Dowell, M.D., *et al*., *CDC Guideline for Prescribing Opioids for Chronic Pain— United States 2016,* 65(1) Morbidity & Mortality Wkly. Rep. 1, 21 (Mar. 18, 2016) (hereinafter, "CDC Guideline").

As the CDC Guideline states, "[o]pioid pain medication use presents serious risks, including overdose and opioid use disorder" (a diagnostic term for addiction).[29]

75.     When it launched OxyContin, Purdue knew it would need data to overcome decades of wariness regarding opioid use. It needed some sort of research to back up its messaging.  But Purdue had not conducted any studies about abuse potential or addiction risk as part of its application for FDA approval for OxyContin. Purdue (and, the Sackler Defendants) found this "research" in the form of a one-paragraph letter to the editor published in the *New England Journal of Medicine* (NEJM) in 1980.

76.     This letter, by Dr. Hershel Jick and Jane Porter, declared the incidence of addiction "rare" for patients treated with opioids.[30] They had analyzed a database of hospitalized  patients who were given opioids in a controlled setting to ease suffering from acute pain. Porter and Jick considered a patient not addicted if there was no sign of addiction noted in patients' records.

77.     As Dr. Jick explained to a journalist years later, he submitted the statistics to NEJM as a letter because the data were not robust enough to be published as a study.[31]

---

[29] *Id.* at 2.

[30] Jane Porter & Herschel Jick, M.D., *Addiction Rare in Patients Treated with Narcotics*, 302(2) New Engl. J. Med. 123 (Jan. 10, 1980), http://www.nejm.org/doi/pdf/10.1056/NEJM198001103020221.

[31] Barry Meier, *Pain Killer: A "Wonder" Drug's Trail of Addiction and Death* (St. Martin's Press, 1st ed. 2003).

**ADDICTION RARE IN PATIENTS TREATED
WITH NARCOTICS**

*To the Editor:* Recently, we examined our current files to deter-
mine the incidence of narcotic addiction in 39,946 hospitalized
medical patients[1] who were monitored consecutively. Although
there were 11,882 patients who received at least one narcotic prep-
aration, there were only four cases of reasonably well documented
addiction in patients who had no history of addiction. The addic-
tion was considered major in only one instance. The drugs im-
plicated were meperidine in two patients,[2] Percodan in one, and
hydromorphone in one. We conclude that despite widespread use of
narcotic drugs in hospitals, the development of addiction is rare in
medical patients with no history of addiction.

JANE PORTER
HERSHEL JICK, M.D.
Boston Collaborative Drug
Surveillance Program
Waltham, MA 02154          Boston University Medical Center

1. Jick H, Miettinen OS, Shapiro S, Lewis GP, Siskind Y, Slone D.
   Comprehensive drug surveillance. JAMA. 1970; 213:1455-60.
2. Miller RR, Jick H. Clinical effects of meperidine in hospitalized medical
   patients. J Clin Pharmacol. 1978; 18:180-8.

78.     Purdue nonetheless began repeatedly citing this letter in promotional and
educational materials as evidence of the low risk of addiction, while failing to disclose that its
source was a letter to the editor, not a peer-reviewed paper.[32] Citation of the letter, which was
largely ignored for more than a decade, significantly increased after the introduction of OxyContin.
While first Purdue used it to assert that their opioids were not addictive, "that's not in any shape
or form what we suggested in our letter," according to Dr. Jick.

79.     Purdue specifically used the Porter and Jick letter in its 1998 promotional video, "I
got my life back," in which Dr. Alan Spanos says, "In fact, the rate of addiction amongst pain
patients who are treated by doctors *is much less than 1%.*"[33] Purdue trained its sales
representatives to tell prescribers that fewer than 1% of patients who took OxyContin became
addicted. (In 1999, a Purdue-funded study of patients who used OxyContin for headaches found
that the addiction rate was thirteen per cent.)[34]

---

[32] Porter & Jick, *supra* note 30.
[33] *Our Amazing World, Purdue Pharma OxyContin Commercial*, YouTube (Sept. 22, 2016),
https://www.youtube.com/watch?v=Er78Dj5hyeI.
[34] Keefe, *Empire of Pain, supra* note 15.

80.     The enormous impact of Purdue's misleading amplification of this letter was well documented in another letter published in the NEJM on June 1, 2017, describing the way the one-paragraph 1980 letter had been irresponsibly cited and in some cases "grossly misrepresented." In particular, the authors of this letter explained:

> [W]e found that a five-sentence letter published in the *Journal* in 1980 was heavily and uncritically cited as evidence that addiction was rare with long-term opioid therapy. We believe that this citation pattern contributed to the North American opioid crisis by helping to shape a narrative that allayed prescribers' concerns about the risk of addiction associated with long-term opioid therapy . . .[35]

81.     "It's difficult to overstate the role of this letter," said Dr. David Juurlink of the University of Toronto, who led the analysis. "It was the key bit of literature that helped the opiate manufacturers convince front-line doctors that addiction is not a concern."[36]

82.     Alongside its use of the Porter and Jick letter, Purdue also crafted its own materials and spread its deceptive message through numerous additional channels. In its 1996 press release announcing the release of OxyContin, for example, Purdue declared, "The fear of addiction is exaggerated."[37]

83.     At a hearing before the House of Representatives' Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce in August 2001, Purdue emphasized "legitimate" treatment, dismissing cases of overdose and death as something that would not befall "legitimate" patients: "Virtually all of these reports involve people who are abusing the

---

[35] Pamela T.M. Leung, B.Sc. Pharm., *et al.*, *A 1980 Letter on the Risk of Opioid Addiction*, 376 New Engl. J. Med. 2194, 2194-95 (June 1, 2017), http://www.nejm.org/doi/full/10.1056/NEJMc1700150.

[36] Marilynn Marchione, Assoc. Press, *Painful Words: How a 1980 Letter Fueled the Opioid Epidemic*, STAT News (May 31, 2017), https://www.statnews.com/2017/05/31/opioid-epidemic- nejm-letter/.

[37] Press Release, Purdue Pharma, L.P., New Hope for Millions of Americans Suffering from Persistent Pain: Long-Acting OxyContin Tablets Now Available to Relieve Pain (May 31, 1996, 3:47pm), http://documents.latimes.com/oxycontin-press-release-1996/.

medication, not patients with legitimate medical needs under the treatment of a healthcare professional."[38]

84.     Purdue spun this baseless "legitimate use" distinction out even further in a patient brochure about OxyContin, called "A Guide to Your New Pain Medicine and How to Become a Partner Against Pain." In response to the question "Aren't opioid pain medications like OxyContin Tablets 'addicting'?," Purdue claimed that there was no need to worry about addiction if taking opioids for legitimate, "medical" purposes:

> Drug addiction means using a drug to get "high" rather than to relieve pain. You are taking opioid pain medication for medical purposes. The medical purposes are clear and the effects are beneficial, not harmful.

85.     Sales representatives marketed OxyContin as a product "to start with and to stay with."[39] Sales representatives also received training in overcoming doctors' concerns about addiction with talking points they knew to be untrue about the drug's abuse potential. One of Purdue's early training memos compared doctor visits to "firing at a target," declaring that "[a]s you prepare to fire your 'message,' you need to know where to aim and what you want to hit!"[40] According to the memo, the target is physician resistance based on concern about addiction: "The physician wants pain relief for these patients without addicting them to an opioid."[41]

86.     Former sales representative Steven May, who worked for Purdue from 1999 to 2005, explained to a journalist how he and his coworkers were trained to overcome doctors' objections to prescribing opioids. The most common objection he heard about prescribing OxyContin was that "it's just too addictive."[42] May and his coworkers were trained to "refocus"

---

[38] *OxyContin: Its Use and Abuse: Hearing Before the H. Subcomm. on Oversight and Investigations of the Comm. on Energy and Com.*, 107th Cong. 1 (Aug. 28, 2001) (Statement of Michael Friedman, Executive Vice President, Chief Operating Officer, Purdue Pharma, L.P.), https://www.gpo.gov/fdsys/pkg/CHRG-107hhrg75754/html/CHRG-107hhrg75754.htm.
[39] Keefe, *Empire of Pain*, *supra* note 15.
[40] Meier, *supra* note 31 at 102.
[41] *Id.*
[42] Interview by Patrick Keefe with Steven Mays, former sales representative for Purdue Pharma, L.P., *How OxyContin Was Sold to the Masses*, The New Yorker (Oct. 27, 2017), https://www.newyorker.com/podcast/the-new-yorker-radio-hour/how-oxycontin-was-sold-to-the- masses.

doctors on "legitimate" pain patients, and to represent that "legitimate" patients would not become addicted. In addition, they were trained to say that the 12-hour dosing made the extended-release opioids less "habit-forming" than painkillers that need to be taken every four hours.

87.    According to interviews with prescribers and former Purdue sales representatives, Purdue has continued to distort or omit the risk of addiction while failing to correct its earlier misrepresentations, leaving many doctors with the false impression that pain patients will only rarely become addicted to opioids.

88.    With regard to addiction, Purdue's label for OxyContin has not sufficiently disclosed the true risks to, and experiences of, its patients. Until 2014, the OxyContin label stated in a black-box warning that opioids have "abuse potential" and that the "risk of abuse is increased in patients with a personal or family history of substance abuse."

89.    However, the FDA made clear to Purdue as early as 2001 that the disclosures in its OxyContin label were insufficient. █████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████

90.    ██████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████████████

91.     In 2001, Purdue revised the indication and warnings for OxyContin, ███████████ ███████████████████████████████████████████████████████████████ In the United States, Purdue ceased distributing the 160 mg tablet of OxyContin. ████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████

92.     In the end, Purdue narrowed the recommended use of OxyContin to situations when "a continuous, around-the-clock analgesic is needed for an extended period of time" and added a warning that "[t]aking broken, chewed, or crushed OxyContin tablets" could lead to a "potentially fatal dose." However, Purdue did not, until 2014, change the label ████████████████, to indicate that OxyContin should not be the first therapy, or even the first opioid, used, and did not disclose the incidence or risk of overdose and death even when OxyContin was not abused.  Purdue announced the label changes in a letter to health care providers ██████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████

93.     ███████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████ Upon information and belief, Purdue never undertook that effort.

### (2)   Falsehood #2: To the extent there is a risk of addiction, it can be easily identified and managed

94.     While continuing to maintain that most patients can safely take opioids long-term for chronic pain without becoming addicted, Purdue asserted that to the extent that *some* patients are at risk of opioid addiction, doctors can effectively identify and manage that risk by using screening tools or questionnaires. In materials they produced, sponsored, or controlled, Defendants instructed patients and prescribers that screening tools can identify patients predisposed to addiction, thus making doctors feel more comfortable prescribing opioids to their patients and patients more comfortable starting opioid therapy for chronic pain. These tools, they say, identify those with higher addiction risks (stemming from personal or family histories of substance use, mental illness, trauma, or abuse) so that doctors can then more closely monitor those patients.

95.     Purdue shared its *Partners Against Pain* "Pain Management Kit," which contains several screening tools and catalogues of Purdue materials, which included these tools, with prescribers.

96.     Purdue sponsored a 2011 webinar entitled *Managing Patient's Opioid Use: Balancing the Need and Risk*. This publication misleadingly taught prescribers that screening tools, urine tests, and patient agreements have the effect of preventing "overuse of prescriptions" and "overdose deaths." Purdue sponsored another 2011 CME program titled *Managing Patient's Opioid Use: Balancing the Need and Risk*. This presentation also deceptively instructed prescribers that screening tools, patient agreements, and urine tests prevented "overuse of prescriptions" and "overdose deaths."

97.     Purdue also funded a 2012 CME program called *Chronic Pain Management and Opioid Use: Easing Fears, Managing Risks, and Improving Outcomes*. The presentation deceptively instructed doctors that, through the use of screening tools, more frequent refills, and other techniques, even high-risk patients showing signs of addiction could be treated with opioids.

98.     There are three fundamental flaws in the Sackler Defendants' and Purdue's representations that doctors can consistently identify and manage the risk of addiction. First, there is no reliable scientific evidence that doctors can depend on the screening tools currently available to materially limit the risk of addiction. Second, there is no reliable scientific evidence that high-risk  patients identified through screening can take opioids long-term without triggering addiction, even with enhanced monitoring. Third, there is no reliable scientific evidence that patients who are not identified through such screening can take opioids long-term without significant danger of addiction.

### (3)     Falsehood #3: Signs of addictive behavior are "pseudoaddiction," requiring more opioids

99.     Purdue instructed patients and prescribers that signs  of addiction are actually indications of untreated pain, such that the appropriate response is to prescribe even more opioids. Dr. David Haddox, who later became a Senior Medical Director for Purdue, published a study in 1989 coining the term "pseudoaddiction," which he characterized as "the iatrogenic syndrome of abnormal behavior developing as a direct consequence of inadequate pain management."[43] In other words, people on prescription opioids who exhibited classic  signs of addiction—for example, asking for more and higher doses of opioids, self-escalating their doses, or claiming to have lost prescriptions in order to get more opioids—were not addicted, but  rather simply suffering from under treatment of their pain.

100.     In the materials and outreach they produced, sponsored, or controlled,  Purdue made each of these misrepresentations and omissions, and has never acknowledged, retracted, or corrected them.

101.     Purdue posted an unbranded pamphlet entitled *Clinical Issues in Opioid Prescribing* on its unbranded website, *www.PartnersAgainstPain.com*, in 2005, and circulated this

---

[43]  David E. Weissman & J. David Haddox, *Opioid Pseudoaddiction—An Iatrogenic Syndrome*, 36(3) Pain 363, 363-66 (Mar. 1989), https://www.ncbi.nlm.nih.gov/pubmed/2710565 ("Iatrogenic" describes a condition induced by medical treatment).

pamphlet through at least 2007 and on its website through at least 2013. The pamphlet listed conduct including "illicit drug use and deception" that it claimed was not evidence of true addiction but "pseudoaddiction" caused by untreated pain.

102.    According to documents provided by a former Purdue detailer, sales representatives were trained and tested on the meaning of pseudoaddiction, from which it can be inferred that sales representatives were directed to, and did, describe pseudoaddiction to prescribers. Purdue's Pain Management Kit is another example of publication used by Purdue's sales force that endorses pseudoaddiction by claiming that "pain-relief seeking behavior can be mistaken for drug-seeking behavior." Upon information and belief, the kit was in use from roughly 2011 through at least June 2016.

103.    The CDC Guideline nowhere recommends attempting to provide more opioids to patients exhibiting symptoms of addiction.

### (4)    Falsehood #4: Opioid withdrawal can be avoided by tapering

104.    In an effort to underplay the risk and impact of addiction, Purdue falsely claimed that, while patients become physically dependent on opioids, physical dependence is not the same as addiction and can be easily addressed, if and when pain relief is no longer desired, by gradually tapering patients' dose to avoid the adverse effects of withdrawal. Defendants failed to disclose the extremely difficult and painful effects that patients can experience when they are removed from opioids—adverse effects that also make it less likely that patients will be able to stop using the drugs. Defendants also failed to disclose how difficult it is for patients to stop using opioids after they have used them for prolonged periods.

105.    Purdue sponsored *A Policymaker's Guide to Understanding Pain & Its Management*, which taught that "[s]ymptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation," but the guide did not disclose the significant hardships that often accompany cessation of use.

33

106.    To this day, Purdue have not corrected or retracted their misrepresentations regarding tapering as a solution to opioid withdrawal.

### (5)    Falsehood #5: Opioid doses can be increased without limit or greater risks

107.    In materials it produced, sponsored or controlled, Purdue instructed prescribers that they could safely increase a patient's dose to achieve pain relief. Each of Purdue's claims was deceptive in that it omitted warnings of increased adverse effects that occur at higher doses, effects confirmed by scientific evidence.

108.    These misrepresentations were integral to Purdue's promotion of prescription opioids. As discussed above, patients develop a tolerance to opioids' analgesic effects, so that achieving long-term pain relief requires constantly increasing the dose.

109.    ███████████████████████████████████████████████████████████████████████████████████████████████



---

[44] Letter from Windell Fisher, Purdue Regional Manager, to B. Gergely, Purdue Employee (Nov. 7, 1996), http://documents.latimes.com/sales-manager-on12-hour-dosing-1996/ (last updated May 5, 2016) (hereinafter, "Letter from Fisher").

110.    In addition, sales representatives aggressively pushed doctors to prescribe stronger doses of opioids.  For example, one Purdue sales representative wrote about how his regional manager would drill the sales team on their upselling tactics:

> It went something like this. "Doctor, what is the highest dose of OxyContin you have ever prescribed?" "20mg Q12h." "Doctor, if the patient tells you their pain score is still high you can increase the dose 100% to 40mg Q12h, will you do that?" "Okay." "Doctor, what if that patient them came back and said their pain score was still high, did you know that you could increase the OxyContin dose to 80mg Q12h, would you do that?" "I don't know, maybe." "Doctor, but you do agree that you would at least Rx the 40mg dose, right?"  "Yes."
>
> The next week the rep would see that same doctor and go through the same discussion with the goal of selling higher and higher doses of OxyContin.

111.    These misrepresentations were particularly dangerous.  As noted above, opioid doses at or above 50 MME/day double the risk of overdose compared to 20 MME/day, and 50 MME is equal to just 33 mg of oxycodone.  The recommendation of 320 mg every twelve  hours is ten times that.

112.    In its 2010 Risk Evaluation and Mitigation Strategy ("REMS") for OxyContin, however, Purdue does not address the increased risk of respiratory depression and death from increasing dose, and instead advises prescribers that "dose adjustments may be made every 1-2 days"; "it is most appropriate to increase the q12h dose"; the "total daily dose can usually be increased by 25% to 50%"; and if "significant adverse reactions occur, treat them aggressively until they are under control, then resume upward titration."[45]

113.    Purdue and the Sackler Defendants were aware of the greater dangers high-dose opioids posed. In 2013, the FDA acknowledged "that the available data do suggest a relationship between increasing opioid dose and risk of certain adverse events" and that studies "appear to credibly suggest a positive association between high-dose opioid use and the risk

---

[45]    Purdue   Pharma,   L.P.,   *OxyContin   Risk   Evaluation   and   Mitigation   Strategy*, https://web.archive.org/web/20170215190303/https://www.fda.gov/downloads/Drugs/DrugSafet y/PostmarketDrugSafetyInformationforPatientsandProviders/UCM220990.pdf (last modified Nov. 2010).

of overdose and/or overdose mortality." A study of the Veterans Health Administration from 2004 to 2008 found the rate of overdose deaths is directly related to maximum daily dose.

### (6)   Falsehood #6: Long-term opioid use improves functioning

114.   Despite the lack of evidence of improved function and the existence of evidence to the contrary, Purdue consistently promoted opioids as capable of improving patients' function and quality of life because they viewed these claims as a critical part of their marketing strategies.  In recalibrating the risk-benefit analysis for opioids, increasing the perceived benefits of treatment was necessary to overcome its risks.

115.   Purdue at relevant times noted the need to compete with the messaging of its competitors, despite the lack of data supporting improvement in quality of life with OxyContin treatment:

> Janssen has been stressing decreased side effects, especially constipation, as well as patient quality of life, as supported by patient rating compared to sustained release morphine . . . We do not have such data to support OxyContin promotion. . . . In addition, Janssen has been using the "life uninterrupted" message in promotion of Duragesic for non-cancer pain, stressing that Duragesic "helps patients think less about their pain." This is a competitive advantage based on our inability to make any quality of life claims.[46]

116.   Despite its acknowledgment that "[w]e do not have such data to support OxyContin promotion," Purdue ran a full-page ad for OxyContin in the Journal of the American Medical Association, proclaiming, "There Can Be Life With Relief," and showing a man happily fly-fishing alongside his grandson, implying that OxyContin would help users' function. This ad earned a warning letter from the FDA, which admonished, "It is particularly disturbing that your November ad would tout 'Life With Relief' yet fail to warn that patients can die from taking OxyContin."[47]

---

[46] Meier, *supra* note 31, at 281.
[47] Chris Adams, *FDA Orders Purdue Pharma to Pull Its OxyContin Ads*, Wall St. J. (Jan. 23, 2003, 12:01am), https://www.wsj.com/articles/SB1043259665976915824.

117.    Purdue sponsored an article, titled *A Policymaker's Guide to Understanding Pain & Its Management*, which claimed that "multiple clinical studies" have shown that opioids are effective in improving daily function, psychological health, and health-related quality of life for chronic pain patients.  But, the article cited as support for this in fact stated the contrary, noting the absence of long-term studies and concluding, "[f]or functional outcomes, the other analgesics were significantly more effective than were opioids."

118.    A series of medical journal advertisements for OxyContin in 2012 presented "Pain Vignettes"—case studies featuring patients with pain conditions persisting over several months—that implied functional improvement. For example, one advertisement described a "writer with osteoarthritis of the hands" and implied that OxyContin would help him work more effectively.

119.    Purdue's claims that long-term use of opioids improves  patient function and quality of life are unsupported by clinical evidence. There are no controlled studies of the use of opioids beyond 16 weeks, and there is no evidence that opioids improve patients' pain and function long term. The FDA, for years, has made clear through warning letters to manufacturers the lack of evidence for claims that the use of opioids for chronic pain improves patients' function and quality of life.[48] Based upon a review of the existing scientific evidence, the CDC Guideline concluded that "there is no good evidence that opioids improve pain or function with long-term use."[49]

120.    Consistent with the CDC's findings, substantial evidence exists demonstrating that opioid drugs are ineffective for the treatment of chronic pain and worsen patients' health. For

---

[48] The FDA has warned other drugmakers that claims of improved function and quality of life were misleading.  *See* Warning Letter from Thomas Abrams, Dir., FDA Div. of Mktg., Adver., & Comm'ns, to Doug Boothe, CEO, Actavis Elizabeth LLC (Feb. 18, 2010), (rejecting claims that Actavis' opioid, Kadian, had an "overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life."); Warning Letter from Thomas Abrams, Dir., FDA Div. of Mktg., Adver., & Comm'ns, to Brian A. Markison, Chairman, President and Chief Executive Officer, King Pharmaceuticals, Inc. (March 24, 2008), (finding the claim that "patients who are treated with [Avinza (morphine sulfate ER)] experience an improvement in their overall function, social function, and ability to perform daily activities . . . has not been demonstrated by substantial evidence or substantial clinical experience.").  The FDA's warning letters were available to Defendants on the FDA website.

[49] CDC Guideline, *supra* note 28, at 20.

example, a 2006 study-of-studies found that opioids as a class did not demonstrate improvement in functional outcomes over other non-addicting treatments. The few longer-term studies of opioid use had "consistently poor results," and "several studies have showed that [using] opioids for chronic pain may actually worsen pain and functioning,"[50] along with general health, mental health, and social function. Over time, even high doses of potent opioids often fail to control pain, and patients exposed to such doses are unable to function normally.

121.    The available evidence indicates opioids may worsen patients' health and pain. Increased duration of opioid use is ~~also~~ strongly associated with increased prevalence of mental health disorders (depression, anxiety, post-traumatic stress disorder, and substance abuse), increased psychological distress, and greater health care utilization. The CDC Guideline concluded that "[w]hile benefits for pain relief, function and quality of life with long-term opioid use for chronic pain are uncertain, risks associated with long-term opioid use are clearer and significant."[51] According to the CDC, "for the vast majority of patients, the known, serious, and too-often-fatal risks far outweigh the unproven and transient benefits [of opioids for chronic pain]."[52]

122.    As one pain specialist observed, "opioids may work acceptably well for a while, but over the long term, function generally declines, as does general health, mental health, and social functioning. Over time, even high doses of potent opioids often fail to control pain, and these patients are unable to function normally."[53] In fact, research such as a 2008 study in the journal *Spine* has shown that pain sufferers prescribed opioids long-term suffered addiction that made them more likely to be disabled and unable to work.[54] Another study demonstrated that injured workers who received a prescription opioid for more than seven days during the first six

---

[50] Thomas R. Frieden and Debra Houry, *Reducing the Risks of Relief—The CDC Opioid-Prescribing Guideline*, New Eng. J. of Med., at 1503 (Apr. 21, 2016).
[51] CDC Guideline, *supra* note 28, at 2, 18.
[52]  Frieden & Houry, *Reducing the Risks of Relief*, *supra* note 50, at 1503.
[53] Andrea Rubinstein, *Are We Making Pain Patients Worse?*, Sonoma Med. (Fall 2009), http://www.nbcms.org/about-us/sonoma-county-medical-association/magazine/sonoma-medicine-are-we-making-pain-patients-worse.aspx?pageid=144&tabid=747.
[54] Jeffrey Dersh, *et al.*, *Prescription Opioid Dependence is Associated With Poorer Outcomes in Disabling Spinal Disorders*, 33(20) Spine 2219-27 (Sept. 15, 2008).

weeks after the injury were 2.2 times more likely to remain on work disability a year later than workers with similar injuries who received no opioids at all.[55]

<div align="center">

(7)     Falsehood #7: Alternative forms of pain relief
pose greater risks than opioids

</div>

123.    In materials they produced, sponsored or controlled, Purdue omitted known risks of chronic opioid therapy and emphasized or exaggerated risks of competing products so that prescribers and patients would favor opioids over other therapies such as over- the-counter acetaminophen or over-the-counter or prescription NSAIDs.

124.    For example, in addition to failing to disclose in promotional materials the risks of addiction, overdose, and death, Purdue routinely ignored the risks of hyperalgesia, a "known serious risk associated with chronic opioid analgesic therapy in which the patient becomes more sensitive to certain painful stimuli over time;"[56] hormonal dysfunction;[57] decline in immune function; mental clouding, confusion, and dizziness; increased falls and fractures in the elderly;[58] neonatal abstinence syndrome (when an infant exposed to opioids prenatally suffers withdrawal after birth), and potentially fatal interactions with alcohol or with benzodiazepines, which are used to treat anxiety and may be co-prescribed with opioids, particularly to veterans suffering from pain.[59]

125.    The APF's *Treatment Options: A Guide for People Living with Pain*, co-sponsored by Purdue, warned that risks of NSAIDs increase if "taken for more than a period of months," with no corresponding warning about opioids. The publication falsely attributed 10,000 to 20,000 deaths annually to NSAID overdoses, when the figure is closer to 3,200.

[55] GM Franklin, BD Stover, JA Turner, D Fulton-Kehoe, TM Wickizer, *Early Opioid Prescription and Subsequent Disability Among Workers With Back Injuries: The Disability Risk Identification Study Cohort*, 33(2) Spine 199, 201-202 (Jan. 15, 2008).
[56] Letter from Janet Woodcock, M.D., Dir. of Ctr. for Drug Eval. & Res., to Andrew Kolodny, M.D., Pres. of Physicians for Responsible Opioid Prescribing, Re Docket No. FDA-2012-P-0818 (Sept. 10, 2013).
[57] H.W. Daniell, *Hypogonadism in Men Consuming Sustained-Action Oral Opioids*, 3(5) J.Pain 377, 377-84 (2001).
[58] Bernhard M. Kuschel, *The Risk of Fall Injury in Relation to Commonly Prescribed Medications Among Older People—A Swedish Case-Control Study*, 25(3) Eur. J. Pub. H. 527, 527-32 (July 31, 2014).
[59] Karen H. Seal *et al.*, *Association of Mental Health Disorders With Prescription Opioids and High-Risk Opioids in US Veterans of Iraq and Afghanistan*, 307(9) J. of Am. Med. Assoc. 940, 940-47 (2012).

126.    As a result of Purdue's deceptive promotion of opioids over safer and more effective drugs, opioid prescriptions increased even as the percentage of patients visiting a doctor for pain remained constant. A study of 7.8 million doctor visits between 2000 and  2010 found that opioid prescriptions increased from 11.3% to 19.6% of visits, as NSAID  and acetaminophen prescriptions fell from 38% to 29%, driven primarily by the decline in NSAID prescribing.

### (8)    Falsehood #8: OxyContin provides twelve hours of pain relief

127.    Purdue also dangerously misled doctors and patients about OxyContin's  duration and onset of action, making the knowingly false claim that OxyContin would provide 12 hours of pain relief for most patients. As laid out below, Purdue made this claim for two reasons. First, it provides the basis for both Purdue's patent and its market niche, allowing it to both protect and differentiate itself from competitors.  Second, it allowed Purdue to imply or state outright that OxyContin had a more even, stable release mechanism that avoided peaks and valleys and therefore the rush that fostered addiction and attracted abusers.

128.    Purdue promotes OxyContin as an extended-release opioid, but the oxycodone does not enter the body at a linear rate. OxyContin works by releasing a greater proportion  of oxycodone into the body upon administration, and the release gradually tapers, as illustrated in the following chart, which was apparently adapted from Purdue's own sales materials:



129.     The reduced release of the drug over time means that the oxycodone no longer provides the same level of pain relief; as a result, in many patients, OxyContin does not last for the twelve hours for which Purdue promotes it—a fact that Purdue has known at all times relevant to this action.

130.     OxyContin tablets provide an initial absorption of approximately 40% of the active medicine. This has a two-fold effect. First, the initial rush of nearly half of the powerful opioid triggers a powerful psychological response. OxyContin thus behaves more like an immediate-release opioid, which Purdue itself once claimed was more addicting in its original 1995 FDA-approved drug label. Second, the initial burst of oxycodone means that there is less of the drug at the end of the dosing period, which results in the drug not lasting for a full twelve hours and precipitates withdrawal symptoms in patients, a phenomenon known as "end of dose" failure. (The FDA found in 2008 that a "substantial number" of chronic pain patients will experience end-of-dose failure with OxyContin.)

131.     End-of-dose failure renders OxyContin even more dangerous because patients begin to experience withdrawal symptoms, followed by a euphoric rush with their next dose—a cycle that fuels a craving for OxyContin. For this reason, Dr. Theodore Cicero, a neuropharmacologist at the Washington University School of Medicine in St. Louis, has called OxyContin's 12-hour dosing "the perfect recipe for addiction."[60] Many patients will exacerbate this cycle by taking their next dose ahead of schedule or resorting to a rescue dose of another opioid, increasing the overall amount of opioids they are taking.

132.     It was Purdue's decision, at the direction of the Sackler Defendants, to submit OxyContin for approval with 12-hour dosing. While the OxyContin label indicates that "[t]here are no well-controlled clinical studies evaluating the safety and efficacy with dosing more frequently than every 12 hours," that is because Purdue has conducted no such studies.

---

[60] Harriet Ryan, *et al*., "'*You Want a Description of Hell?' OxyContin's 12-Hour Problem*," L.A. Times, May 5, 2016, http://www.latimes.com/projects/oxycontin-part1/ (hereinafter, *"You Want a Description of Hell?"*).

133.    Purdue nevertheless has falsely promoted OxyContin as if it were effective for a full twelve hours. Its advertising in 2000 included claims that OxyContin provides "Consistent Plasma Levels Over 12 Hours." That claim was accompanied by a chart, mirroring the chart on the previous page. However, this version of the chart deceptively minimized the rate of end-of-dose failure by depicting 10 mg in a way that it appeared to be half of 100 mg in the table's y-axis. That chart, shown below, depicts the same information as the chart above, but does so in a way that makes the absorption rate appear more consistent:



134.    Purdue's 12-hour messaging was key to its competitive advantage over short-acting opioids that required patients to wake in the middle of the night to take their pills.  Purdue advertisements also emphasized "Q12h" dosing. These include an advertisement in the February 2005 *Journal of Pain* and 2006 *Clinical Journal of Pain* featuring an OxyContin logo with two pill cups, reinforcing the twice-a-day message. A Purdue memo to the OxyContin launch team stated that "OxyContin's positioning statement is 'all of the analgesic efficacy of immediate-

release oxycodone, with convenient q12h dosing,'" and further that "[t]he convenience of q12h dosing was emphasized as the most important benefit."[61]

135.    In keeping with this positioning statement, a Purdue regional manager emphasized in a 1996 sales strategy memo that representatives should "convince[e] the physician that there is no need" for prescribing OxyContin in shorter intervals than the recommended 12-hour interval, and instead the solution is prescribing higher doses.[62] One sales manager instructed her team that anything shorter than 12-hour dosing "needs to be nipped in the bud, NOW!!"[63]

136.    Purdue executives therefore maintained the messaging of twelve-hour dosing even when many reports surfaced that OxyContin did not last twelve hours. Instead of acknowledging a need for more frequent dosing, Purdue instructed its representatives to push higher-strength pills, even though higher dosing carries its own risks, as noted above. It also means that patients will experience higher highs and lower lows, increasing their craving for their next pill. (Urging higher doses to avoid end-of-dose failure is like advising a pilot to avoid a crash by flying higher.) Nationwide, based on an analysis by the *Los Angeles Times*, more than 52% of patients taking OxyContin longer than three months are on doses greater than 60 milligrams per day—which converts to the 90 MED that the CDC Guideline urges prescribers to "avoid" or "carefully justify."[64]

137.    That OxyContin did not provide pain relief for a full twelve hours was known to Purdue, and Purdue's competitors, but was not disclosed to prescribers. Purdue's knowledge of some pain specialists' tendency to prescribe OxyContin three times per day instead of two was set out in Purdue's internal documents as early as 1999 and is apparent from MedWatch Adverse Event reports for OxyContin.

---

[61] Memorandum from Lydia Johnson, Marketing Executive at Purdue, to members of OxyContin Launch Team (Apr. 4, 1995), http://documents.latimes.com/oxycontin-launch-1995/ (last updated May 5, 2016).

[62] Letter from Fisher, *supra* note 44.

[63] *You Want a Description of Hell?*, *supra* note 60.

[64] CDC Guideline, *supra* note 28, at 16.

138.    Purdue's failure to disclose the prevalence of end-of-dose failure meant that prescribers were misinformed about the advantages of OxyContin in a manner that preserved Purdue's competitive advantage and profits, at the expense of patients, who were placed at greater risk of overdose, addiction, and other adverse effects.

(9)    **Falsehood #9: New formulations of certain opioids successfully deter abuse**

139.    Rather than take the widespread opioid abuse of and addiction to opioids as reason to cease their untruthful marketing efforts, Purdue and the Sackler Defendants seized them as a competitive opportunity. Purdue developed and oversold "abuse-deterrent formulation" ("ADF") opioids as a solution to opioid abuse and as a reason that doctors could continue to safely prescribe their opioids, as well as an advantage of these expensive branded drugs over other opioids. These Defendants' false and misleading marketing of the benefits of their ADF opioids preserved and expanded their sales and falsely reassured prescribers thereby prolonging the opioid epidemic.

140.    The CDC Guideline confirms that "[n]o studies" support the notion that "abuse-deterrent technologies [are] a risk mitigation strategy for deterring or preventing abuse," noting that the technologies "do not prevent opioid abuse through oral intake, the most common route of opioid abuse, and can still be abused by non-oral routes." Tom Frieden, the former Director of the CDC, reported that his staff could not find "any evidence showing the updated opioids [ADF opioids] actually reduce rates of addiction, overdoses, or deaths."

141.    Reformulated ADF OxyContin was approved by the FDA in April 2010. It was not until 2013 that the FDA, in response to a citizen petition filed by Purdue, permitted reference to the abuse-deterrent properties in its label. When Hysingla ER (extended-release hydrocodone) launched in 2014, the product included similar abuse-deterrent properties and limitations. But in the beginning, the FDA made clear the limited claims that could be made about ADF, noting that no evidence supported claims that ADF prevented tampering, oral abuse, or overall rates of abuse.

142.    It is unlikely a coincidence that reformulated OxyContin was introduced shortly before generic versions of OxyContin were to become available, threatening to erode Purdue's market share and the price it could charge. Purdue nonetheless touted its introduction of ADF opioids as evidence of its good corporate citizenship and commitment to address the opioid crisis.

143.    Despite its self-proclaimed good intention, Purdue merely incorporated its generally deceptive tactics with respect to ADF. Purdue sales representatives regularly overstated and misstated the evidence for and impact of the abuse-deterrent features of these opioids. Specifically, Purdue sales representatives:

    (a)    claimed that Purdue's ADF opioids prevent tampering and that its ADFs could not be crushed or snorted;

    (b)    claimed that Purdue's ADF opioids reduce opioid abuse and diversion;

    (c)    asserted or suggested that its ADF opioids are non-addictive or less addictive;

    (d)    asserted or suggested that Purdue's ADF opioids are safer than other opioids, could not be abused or tampered with, and were not sought out for diversion; and

    (e)    failed to disclose that Purdue's ADF opioids do not impact oral abuse or misuse.

144.    If pressed, Purdue acknowledged that perhaps some "extreme" patients might still abuse the drug, but claimed the ADF features protect the majority of patients. These misrepresentations and omissions are misleading and contrary to Purdue's ADF labels, Purdue's own information, and publicly available data.

145.    Purdue knew or should have known that reformulated OxyContin is not more tamper-resistant than the original OxyContin and is still regularly tampered with and abused.

146.    In 2009, the FDA noted in permitting ADF labeling that "the tamper-resistant properties will have no effect on abuse by the oral route (the most common mode of abuse)". In the 2012 medical office review of Purdue's application to include an abuse-deterrence claim in its

label for OxyContin, the FDA noted that the overwhelming majority of deaths linked to OxyContin were associated with oral consumption, and that only 2% of deaths were associated with recent injection and only 0.2% with snorting the drug.

147.    The FDA's Director of the Division of Epidemiology stated in September 2015 that no data that she had seen suggested the reformulation of OxyContin "actually made a reduction in abuse," between continued oral abuse, shifts to injection of other drugs (including heroin), and defeat of the ADF mechanism. Even Purdue's own funded research shows that half of OxyContin abusers continued to abuse OxyContin orally after the reformulation rather than shift to other drugs.

148.    A 2013 article presented by Purdue employees based on review of data from poison control centers, concluded that ADF OxyContin can reduce abuse, but it ignored important negative findings. The study revealed that abuse merely shifted to other drugs and that, when the actual incidence of harmful exposures was calculated, there were *more* harmful exposures to opioids after the reformulation of OxyContin.  In short, the article deceptively emphasized the advantages and ignored the disadvantages of ADF OxyContin.

149.    Websites and message boards used by drug abusers, such as bluelight.org and reddit.com, report a variety of ways to tamper with OxyContin and Hysingla ER, including through grinding, microwaving then freezing, or drinking soda or fruit juice in which a tablet is dissolved. Purdue has been aware of these methods of abuse for more than a decade.

150.    One-third of the patients in a 2015 study defeated the ADF mechanism and  were able to continue inhaling or injecting the drug.  To the extent that the abuse of Purdue's ADF opioids was reduced, there was no meaningful reduction in opioid abuse overall, as many users simply shifted to other opioids such as heroin.

151.    In 2015, claiming a need to further assess its data, Purdue abruptly withdrew a supplemental new drug application related to reformulated OxyContin one day before FDA staff was to release its assessment of the application. The staff review preceded an FDA  advisory committee meeting related to new studies by Purdue "evaluating the misuse and/or abuse of

46

reformulated OxyContin" and whether those studies "have demonstrated that the reformulated OxyContin product has had a meaningful impact on abuse."[65] Upon information and belief, Purdue never presented the data to the FDA because the data would not have supported claims that OxyContin's ADF properties reduced abuse or misuse.

152. Despite its own evidence of abuse, and the lack of evidence regarding the benefit of Purdue's ADF opioids in reducing abuse, Dr. J. David Haddox, the Vice President of Health Policy for Purdue, falsely claimed in 2016 that the evidence does not show that Purdue's ADF opioids are being abused in large numbers. Purdue's recent advertisements in national newspapers also continues to claim its ADF opioids as evidence of its efforts to reduce opioid abuse, continuing to mislead prescribers, patients, payors, and the public about the efficacy of its actions.

2. **The Sackler Defendants Deliberately Directed Purdue and Rhodes to Disregard Their Duties to Maintain Effective Controls and to Identify, Report, and Take Steps to Halt Suspicious Orders**

153. The Sackler Defendants acted together to create a larger market for opioids than ever should have occurred. The Sackler Defendants compounded this harm by facilitating the supply of far more opioids than could have been justified to serve that market by knowing about but failing to report suspicious orders. The willful failure of the Defendants to maintain effective controls, and to investigate, report, and take steps to halt orders that they knew or should have known were suspicious breached both their statutory and common law duties.

154. For over a decade, as the Sackler Defendants pushed to increase the demand for opioids, Purdue and Rhodes aggressively sought to bolster their revenue, increase profit, and grow their share of the prescription painkiller market by unlawfully and surreptitiously increasing the volume of opioids they sold. However, pharmaceutical companies are not permitted to engage in a limitless expansion of their sales through the unlawful sales of regulated painkillers. Rather,

---

[65] Jill Hartzler Warner, Assoc. Comm'r for Special Med. Programs, *Joint Meeting of the Drug Safety and Risk Management Advisory Committee and the Anesthetic and Analgesic Drug Products Advisory Committee*; *Notice of Meeting*, 80(103) Fed. Reg. 30686, 30686 (May 29, 2015).

as described below, they are subject to various duties to report the quantity of Schedule II controlled substances in order to monitor such substances and prevent oversupply and diversion into the illicit market.

155.   Purdue and Rhodes are required to register as either manufacturers or distributors pursuant to 21 U.S.C. § 823 and 21 C.F.R. §§ 1301.11, 1301.74.

156.   The Sackler Defendants' scheme was resoundingly successful. Chronic opioid therapy—the prescribing of opioids long-term to treat chronic pain—has become a commonplace, and often first-line, treatment. Purdue's deceptive marketing caused prescribing not only of their opioids, but of opioids as a class, to skyrocket. Not only were the name brand drugs such as Purdue's OxyContin aggressively promoted, but the generic opioids sold by Rhodes were also in higher demand due to the Sackler Defendants' overall scheme to increase opioid use and market share in the United States.

157.   According to the CDC opioid prescriptions, as measured by number of prescriptions and morphine milligram equivalent ("MME") per person, tripled from 1999 to 2015. In 2015, on an average day, more than 650,000 opioid prescriptions were dispensed in the U.S. While previously a small minority of opioid sales, today between 80% and 90% of opioids (measured by weight) used are for chronic pain. Approximately 20% of the population between the ages of 30 and 44, and nearly 30% of the population over 45, have used opioids. Opioids are the most common treatment for chronic pain, and 20% of office visits now include the prescription of an opioid.

158.   497. In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses." Patients receiving opioid prescriptions for chronic pain account for the majority of overdoses. For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are

critical "to reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity."[66]

        a.        **Purdue and Rhodes Have a Duty to Report Suspicious Orders and Not to Ship Those Orders Unless Due Diligence Disproves Their Suspicions**

159.     Multiple sources impose duties on companies such as Purdue and Rhodes to report suspicious orders and further to not ship those orders unless due diligence disproves those suspicions.

160.     First, under the common law, Purdue and Rhodes had a duty to exercise reasonable care in delivering dangerous narcotic substances. By flooding the United States with more opioids than could be used for legitimate medical purposes and by filling and failing to report orders that they knew or should have realized were likely being diverted for illicit uses, Purdue and Rhodes breached that duty and both created and failed to prevent a foreseeable risk of harm.

161.     Second, each of Purdue and Rhodes assumed a duty, when speaking publicly about opioids and their efforts to combat diversion, to speak accurately and truthfully.

162.     Third, each of Purdue and Rhodes were required to register with the DEA to manufacture and/or distribute Schedule II controlled substances. *See* 21 U.S.C. § 823(a)-(b), (e); 28 C.F.R. § 0.100. As registrants, Purdue and Rhodes were required to "maint[ain] . . . effective controls against diversion" and to "design and operate a system to disclose . . . suspicious orders of controlled substances." 21 U.S.C. § 823(a)-(b); 21 C.F.R. § 1301.74. Purdue and Rhodes were further required to take steps to halt suspicious orders. Purdue and Rhodes violated their obligations under federal law.

163.     Fourth, as described below, Purdue and Rhodes also had duties under applicable state laws. Recognizing a need for greater scrutiny over controlled substances due to their potential for abuse and danger to public health and safety, the United States Congress enacted the Controlled Substances Act in 1970. The CSA and its implementing regulations created a closed-

---

[66] *Id.*

system of distribution for all controlled substances and listed chemicals. Congress specifically designed the closed chain of distribution to prevent the diversion of legally produced controlled substances into the illicit market. Congress was concerned with the diversion of drugs out of legitimate channels of distribution and acted to halt the "widespread diversion of [controlled substances] out of legitimate channels into the illegal market." Moreover, the closed-system was specifically designed to ensure that there are multiple ways of identifying and preventing diversion through active participation by registrants within the drug delivery chain. All registrants—which includes all manufacturers and distributors of controlled substances—must adhere to the specific security, recordkeeping, monitoring and reporting requirements that are designed to identify or prevent diversion. When registrants at any level fail to fulfill their obligations, the necessary checks and balances collapse. The result is the scourge of addiction that has occurred.

164.    The CSA requires manufacturers and distributors of Schedule II substances like opioids to: (a) limit sales within a quota set by the DEA for the overall production of Schedule II substances like opioids; (b) register to manufacture or distribute opioids; (c) maintain effective controls against diversion of the controlled substances that they manufacture or distribute; and (d) design and operate a system to identify suspicious orders of controlled substances, halt such unlawful sales, and report them to the DEA.

165.    Central to the closed-system created by the CSA was the directive that the DEA determine quotas of each basic class of Schedule I and II controlled substances each year. The quota system was intended to reduce or eliminate diversion from "legitimate channels of trade" by controlling the "quantities of the basic ingredients needed for the manufacture of [controlled substances], and the requirement of order forms for all transfers of these drugs." When evaluating production quotas, the DEA was instructed to consider the following information:

(a)    Information provided by the Department of Health and Human Services;

(b)    Total net disposal of the basic class [of each drug] by all manufacturers;

(c)    Trends in the national rate of disposal of the basic class [of drug];

(d)    An applicant's production cycle and current inventory position;

(e)     Total actual or estimated inventories of the class [of drug] and of all substances manufactured from the class and trends in inventory accumulation; and

(f)     Other factors such as: changes in the currently accepted medical use of substances manufactured for a basic class; the economic and physical availability of raw materials; yield and sustainability issues; potential disruptions to production; and unforeseen emergencies.

166.    It is unlawful to manufacture a controlled substance in Schedule II, like prescription opioids, in excess of a quota assigned to that class of controlled substances by the DEA.

167.    To ensure that even drugs produced within quota are not diverted, federal regulations issued under the CSA mandate that all registrants, manufacturers and distributors alike, "design and operate a system to disclose to the registrant suspicious orders of controlled substances." 21 C.F.R. § 1301.74(b). Registrants are not entitled to be passive (but profitable) observers, but rather "shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant." *Id*. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency. *Id*. Other red flags may include, for example, "[o]rdering the same controlled substance from multiple distributors."

168.    These criteria are disjunctive and are not all inclusive. For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported as suspicious. Likewise, a distributor or manufacturer need not wait for a normal pattern to develop over time before determining whether a particular order is suspicious. The size of an order alone, regardless of whether it deviates from a normal pattern, is enough to trigger the responsibility to report the order as suspicious. The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer but also on the patterns of the entirety of the customer base and the patterns throughout the relevant segment of

the industry. For this reason, identification of suspicious orders serves also to identify excessive volume of the controlled substance being shipped to a particular region.

169.    In sum, Purdue and Rhodes have several responsibilities under the law with respect to control of the supply chain of opioids. First, they must set up a system to prevent diversion, including excessive volume and other suspicious orders. That would include reviewing their own data, relying on their observations of prescribers and pharmacies, and following up on reports or concerns of potential diversion. All suspicious orders must be reported to relevant enforcement authorities. Further, they must also stop shipment of any order which is flagged as suspicious and only ship orders which were flagged as potentially suspicious if, after conducting due diligence, they can determine that the order is not likely to be diverted into illegal channels.

170.    State and federal statutes and regulations reflect a standard of conduct and care below which reasonably prudent manufacturers would not fall. Together, these laws and industry guidelines make clear that distributors and manufacturers alike possess and are expected to possess specialized and sophisticated knowledge, skill, information, and understanding of both the market for scheduled prescription narcotics and of the risks and dangers of the diversion of prescription narcotics when the supply chain is not properly controlled.

171.    Further, these laws and industry guidelines make clear that Purdue and Rhodes have a duty and responsibility to exercise their specialized and sophisticated knowledge, information, skill, and understanding to prevent the oversupply of prescription opioids and minimize the risk of their diversion into an illicit market even though they are merely the manufacturing entities and not the distributors.

172.    Purdue and Rhodes also have specialized and detailed knowledge of the potential suspicious prescribing and dispensing of opioids through their regular visits to doctors' offices and pharmacies, and from their purchase of data from commercial sources, such as IMS Health. Their extensive boots-on-the-ground activity through their sales force allowed Purdue, Rhodes, and the Sackler Defendants to observe the signs of suspicious prescribing and dispensing discussed elsewhere in the Complaint—lines of seemingly healthy patients, out-of-state license

plates, and cash transactions, to name only a few. In addition, Purdue and Rhodes regularly mined data, including, upon information and belief, chargeback data, which allowed them to monitor the volume and type of prescribing of doctors, including sudden increases in prescribing and unusually high dose prescribing, which would have alerted them, independent of their sales representatives, to suspicious prescribing.

173.    Such information was passed on directly to the Sackler Defendants, as discussed in detail below.  This information gave the Sackler Defendants insight into prescribing and dispensing conduct that enabled the Sackler Defendants to identify where sales tactics would be most effective. This information also could have allowed Purdue and Rhodes to play a valuable role in the preventing diversion and fulfilling their obligations under the CSA.

174.    Purdue and Rhodes have a duty, and are expected, to be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes.

175.    Purdue and Rhodes breached these duties, at the direction of the Sackler Defendants, by failing to: (a) control the supply chain; prevent diversion; (c) report suspicious orders; and (d) halt shipments of opioids in quantities they knew or should have known could not be justified and were indicative of serious problems of overuse of opioids.

### b.    Defendants Kept Careful Track of Prescribing Data and Knew About Suspicious Orders and Prescribers

176.    At all relevant times, Purdue and Rhodes and the Sackler Defendants were in possession of national, regional, state, and local prescriber- and patient-level data that allowed them to track prescribing patterns over time.  They obtained this information from data companies, including but not limited to: IMS Health, QuintilesIMS, IQVIA, Pharmaceutical Data Services, Source Healthcare Analytics, NDS Health Information Services, Verispan, Quintiles, SDI Health, ArcLight, Scriptline, Wolters Kluwer, and/or PRA Health Science, and all of their predecessors or successors in interest (the "Data Vendors").

177.    Purdue and Rhodes purchased nationwide, regional, state, and local prescriber- and patient- level data from the Data Vendors that allowed them to track prescribing trends, identify suspicious orders, identify patients who were doctor shopping, identify pill mills, etc. This information was then passed on directly to the Sackler Defendants in order for the Sackler Defendants to direct the marketing and sales strategies for opioid products.

178.    The use of prescriber level data was integral to the Sackler Defendants' scheme to increase the opioid market. Purdue maintained a contract with IMS health for many years to find which doctors to target with their deceptive advertising.[67] This relationship was a natural one for the Sackler Defendants as IMS was co-founded by non-other than Arthur Sackler.[68] Purdue and the Sackler Defendants in generating the massive market for opioids utilized Arthur Sackler's unique pharmaceutical sales techniques of "educating" doctors about the uses and benefits of a product.[69] Therefore, fine-grained data about the prescribing habits of individual doctors was essential in order for the Sackler Defendants to determine which doctors and areas to target for sales.

179.    Such data also could have been used to track patterns of abuse, but preventing abuse was at odds with the Sackler Defendants' scheme to grow the opioid market at all costs.[70] Data such as provided by IMS Health showed the Sackler Defendants which doctors were prescribing what opioids, and the Sackler Defendants could have easily reported high volume prescribers.[71] However, Purdue, as directed by the Sackler Defendants, did not feel that it was up to Purdue to asses "how well a physician practices medicine" and therefore repeatedly failed to report unlawful activity.[72]

180.    Defendants were, therefore, collectively aware of the suspicious orders that flowed daily from their manufacturing facilities and did little to nothing to stop them.

---

[67] Keefe, *Empire of Pain, supra* note 15.
[68] *Id.*
[69] *Id.*
[70] *Id.*
[71] *Id.*
[72] *Id.*

181.    Moreover, Defendants' sales incentives rewarded sales representatives who happened to have pill mills within their territories, enticing those representatives to look the other way even when their in-person visits to such clinics should have raised numerous red flags. In one example, a pain clinic in South Carolina was diverting massive quantities of OxyContin. People traveled to the clinic from towns as far as 100 miles away to get prescriptions, the DEA's diversion unit raided the clinic, and prosecutors eventually filed criminal charges against the doctors. But, Purdue's sales representative for that territory, Eric Wilson, continued to promote OxyContin sales at the clinic. He reportedly told another local physician that this clinic accounted for 40% of the OxyContin sales in his territory. At that time, Wilson was Purdue's top-ranked sales representative. In response to news stories about this clinic, Purdue issued a statement, declaring that "if a doctor is intent on prescribing our medication inappropriately, such activity would continue regardless of whether we contacted the doctor or not."[73][64]

182.    In another example, a Purdue sales manager informed her supervisors in 2009 about a suspected pill mill in Los Angeles, reporting over email that when she visited the clinic with her sales representative, "it was packed with a line out the door, with people who looked like gang members," and that she felt "very certain that this an organized drug ring[.]"[74] She wrote, "This is clearly diversion. Shouldn't the DEA be contacted about this?" But her supervisor at Purdue responded that while they were "considering all angles," it was "really up to [the wholesaler] to make the report."[75] This pill mill was the source of 1.1 million pills trafficked to Everett, Washington, a city of around 100,000 people. Purdue waited until after the clinic was shut down in 2010 to inform the authorities.

183.    Purdue and Rhodes' obligation to report suspicious prescribing ran head-on into the Sackler Defendants' marketing strategy. The Sackler Defendants did identify doctors who were their most prolific prescribers—but not to report them, rather to market to them. It would

---

[73] Meier, *supra* note 31, at 298-300.
[74] Harriet Ryan *et al.*, *More Than 1 Million OxyContin Pills Ended Up in the Hands of Criminals and Addicts. What the Drugmaker Knew*, Los Angeles Time (July 10, 2016), http://www.latimes.com/projects/la-me-oxycontin-part2/.
[75] *Id.*

make little sense to focus on marketing to doctors who may be engaged in improper prescribing only to report them to law enforcement, nor to report those doctors who drove sales.

184.    Marketing visits were focused on increasing, sustaining, or converting the prescriptions of the biggest prescribers, particularly through aggressive, high frequency detailing visits. Overprescribing generated tremendous revenue for the Sackler Defendants through both Purdue and Rhodes.[76] Purdue sales representatives would refer to such doctors as "whales."[77] ███

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████

185.    Diversion of opioids was a necessary part of the Sackler Defendants' scheme to grow the opioid market, and so the Sackler Defendants directed the activities of Purdue and Rhodes in furtherance of that scheme.

### B.    The Sackler Defendants Utilized Purdue to Perpetrate their Scheme to Grow the Demand for Prescription Opioids

186.    This section of the Complaint identifies the individuals who are personally responsible for Purdue's illegal scheme.  The Sackler Defendants distanced themselves from Purdue on paper beginning in 2003, but for the relevant time period, the Sackler Defendants have been intimately involved in each of the decisions to grow and sustain the demand for opioids through deceptive and unlawful marketing.

187.    The breadth of control wielded by the Sackler family began as early as the 1960s. Estes Kefauver, a Tennessee senator, chaired a subcommittee that looked into the rapidly growing pharmaceutical industry.[78] Kefauver—who had previously investigated the mafia—generated a report noting: "The Sackler empire is a completely integrated operation" that "can devise a new drug in its drug development enterprise, have the drug clinically tested and secure favorable

---

[76] Keefe, *Empire of Pain*, *supra* note 15.
[77] *Id.*
[78] *Id.*

reports on the drug from the various hospitals with which they have connections, conceive the advertising approach and prepare the actual advertising copy with which to promote the drug, have the clinical articles as well as advertising copy published in their own medical journals, [and] prepare and plant articles in newspaper and magazines."[79]

188.    The Sackler Defendants have maintained their "empire" through the present by keeping the family businesses, Purdue and Rhodes, firmly within control of the Sackler Defendants. According to Robin Hogen, who was once a communications specialist for Purdue, the Sackler Defendants did not have an arm's length relationship with Purdue.[80] Rather, "[t]his was an active family and an active board."[81] Through the guilty pleas entered by the Purdue Frederick Company in 2007, and to the present, the Sackler Defendants have directed Purdue's deceptive and fraudulent marketing for the financial gain of the Sackler Family.

189.    The individual defendants were the chief architects and beneficiaries of Purdue's deception.  In summary:

(a)    The individual defendants controlled the misconduct described in the paragraphs above.

(b)    Each individual defendant knowingly and intentionally sent sales representatives to promote opioids to prescribers thousands of times.

(c)    Each individual defendant knew and intended that the sales reps would unfairly and deceptively promote opioid sales that are risky for patients, including the nine falsehoods identified above.

(d)    Each individual defendant knew and intended that the sales reps would not tell doctors and patients the truth about Purdue's opioids.  Indeed, they knew and intended these unfair and deceptive tactics achieved their purpose by concealing the truth.

---

[79] *Id.*
[80] *Id.*
[81] *Id.*

(e)     Each individual defendant knew and intended that prescribers, pharmacists, and patients would rely on Purdue's deceptive sales campaign to prescribe, dispense, and take Purdue opioids.  Securing that reliance was the purpose of the sales campaign.

(f)     Each individual defendant knew and intended that staff reporting to them would pay top prescribers tens of thousands of dollars to encourage other doctors to write dangerous prescriptions.

(g)     Each individual defendant knew and intended that staff reporting to them would reinforce these misleading acts through thousands of additional acts, including by sending deceptive publications to doctors and deceptively promoting Purdue opioids.

(h)     Each individual defendant knowingly and intentionally took money from Purdue's deceptive business.

(i)     Each individual defendant knowingly and intentionally sought to conceal his or her misconduct.

190.   Eight people in a single family made the choices that caused much of the opioid epidemic: Richard Sackler, Beverly Sackler, David Sackler, Ilene Sackler Lefcourt, Jonathan Sackler, Kathe Sackler, Mortimer Sackler, and Theresa Sackler.  The Sackler family owns Purdue, and they always held a majority of the seats on its Board.  Because they controlled their own privately held drug company, the Sackler Defendants had the power to decide how addictive narcotics were sold.  They got more patients on opioids, at higher doses, for longer, than ever before.  They paid themselves billions of dollars.  They are responsible for addiction, overdose, and death that damaged millions of lives.  They should be held accountable now.

### 1.      The Sackler Defendants' Misconduct Leading to the 2007 Judgment

191.   The misconduct of Richard, Beverly, Ilene, Jonathan, Kathe, Mortimer, and Theresa Sackler was particularly unfair, deceptive, unreasonable, and unlawful because they

already had been given a second chance.  From the 1990s until 2007, they directed a decade of misconduct, which led to criminal convictions, and commitments that Purdue would not deceive doctors and patients again.  That background confirms that their misconduct since 2007 was knowing and intentional.

192.    The Sackler family's first drug company was the Purdue Frederick Company, which they bought in 1952.  In 1990, they created Purdue Pharma Inc. and Purdue Pharma L.P.  Richard, Beverly, Ilene, Jonathan, Kathe, Mortimer, and Theresa Sackler took seats on the Board.[82]  For events before July 2012, this Complaint uses the "Sackler Defendants" to refer to them. ███████████████████████████████[83]  From that time forward, the "Sackler Defendants" includes him as well.

193.    The Sackler Defendants always insisted that their family control Purdue.  From 1990 until today, their family always held the majority of seats on the Board. ███████████
████████████████████████████████████████████████████████████████
█████████████████████████████████████████[84]

194.    Purdue launched OxyContin in 1996.  It became one of the deadliest drugs of all time.[85] ██████████████████████████████████████████████████████████
████████████████████████[86]  The Sackler Defendants did not agree.  From the beginning, the Sackler Defendants viewed limits on opioids as an obstacle to greater profits.  To make more money, the Sackler Defendants considered whether they could sell OxyContin in some countries as an uncontrolled drug. ███████████████████████████████████
████████████████████████████████████████████████████████████████

---

[82] Purdue Pharma Inc.'s 1991 filings with the Secretary of State of Connecticut state that it was incorporated in New York on October 2, 1990.  Richard, Ilene, Jonathan, and Kathe Sackler are all listed as directors on the earliest (1991) report.  Beverly, Mortimer, and Theresa all appear on the 1995 report.
[83] ██████████████████████
[84] ██████████████████████████████████
[85] See, e.g., 2016-03-15 telebriefing by CDC Director Tom Frieden ("We know of no other medication that's routinely used for a nonfatal condition that kills patients so frequently … those who got the highest doses of opioids, more than 200 MMEs per day had a 1 in 32 chance of dying in just 21/2 years … almost all the opioids on the market are just as addictive as heroin.), available at https://www.cdc.gov/media/releases/2016/t0315-prescribing-opioids-guidelines.html.
[86] ████████████████████████████████



195.

196.

197.     From the start, the Sackler Defendants were also the driving force behind Purdue's strategy to push opioids with the false promise that they create an enhanced "lifestyle." ███

████████████████████████████████████████████████

██████████████████████████████████

198.     Most of all, the Sackler Defendants cared about money.  Millions of dollars were not enough.  They wanted billions.  They cared more about money than about patients, or their employees, or the truth. ███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████

199.     In 1999, Richard Sackler became the CEO of Purdue.  Jonathan, Kathe, and Mortimer were Vice Presidents.[95] ██████████████████████████

████████████████████  ██████████████████████

██████████████████████████  On the crucial issue of addiction, which would damage so many lives, Purdue trained its sales reps to deceive doctors that the risk of addiction was "less than one percent."[97] █████████████████

██████████████████████

████████████████████████

---

[93] ████████████████████████

[94] ████████████████████████

[95] 2000-03-26, Peter Healy, Opening the Medicine Chest: Purdue Pharma prepares to raise its profile, #24865.1.

[96] ████████████████████████████████

[97] Barry Meier, *Pain Killer* (1 ed. 2003) at 99.

[98] ████████████████████

A sales representative told a reporter: "We were directed to lie. Why mince words about it?  Greed took hold and overruled everything.  They saw that potential for billions of dollars and just went after it."[99]



[99] 2017-10-16, Christopher Glazek, "The Secretive Family Making Billions From The Opioid Crisis," *Esquire* Magazine (quoting Purdue sales representative Shelby Sherman).



203.   ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████ ███████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████

204.   ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████

205.   ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████

206.    That spring, Purdue executives met with the U.S. Drug Enforcement Agency ("DEA").  A senior DEA official sat across from Richard Sackler.  Before the meeting ended, she leaned over the table and told Richard: "People are dying.  Do you understand that?"[110]

207.    As Purdue kept pushing opioids and people kept dying, the company was engulfed in a wave of investigations by state attorneys general, the DEA, and the U.S. Department of Justice.  In 2003, Richard Sackler left his position as President of Purdue.  ████████████████

████████████████████████████████████████████████████████████

---

[107] ████████████████████████████████████
[108] ████████████████████████████████████
[109] ████████████████████████████████████
[110] 2001 meeting described in *Pain Killer: A "Wonder" Drug's Trail of Addiction and Death* by Barry Meier, pg. 158 (2003).  The DEA official was Laura Nagel, head of the DEA Office of Diversion Control.

███████ █   But those moves were for show.  The Sackler Defendants kept control of the company.  Their family owned Purdue.  They controlled the Board.  ███████████

████   And, as alleged in detail below, they continued to direct Purdue's deceptive marketing campaign.

208.   ████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
██████████████████████████

209.   In May 2007, ███████████████████████
████████████████████████████████
██████████ █████████████████████
████████████████████████████████
██████████████████

210.   The Sackler Defendants voted to admit in an Agreed Statement Of Facts that, for more than six years, supervisors and employees *intentionally* deceived doctors about OxyContin: "Beginning on or about December 12, 1995, and continuing until on or about June 30, 2000, certain Purdue supervisors and employees, with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications."[114]

---

[111] ███████████████████████████████████
██████████████████████
[112] ██████████████████
[113] █████████████████████████████
[114] 2007-05-09 Agreed Statement of Facts, paragraph 20, *available at* https://www.documentcloud.org/documents/279028-purdue-guilty-plea.

211.    To remove any doubt, the Sackler Defendants voted to enter into a plea agreement that stated: "Purdue is pleading guilty as described above because Purdue is in fact guilty."[115] Those intentional violations of the law happened while Richard Sackler was CEO; Jonathan, Kathe, and Mortimer were Vice Presidents; and Richard, Jonathan, Kathe, Mortimer, Ilene, Beverly, and Theresa Sackler were all on the Board.

212.    The Sackler Defendants also voted for Purdue to enter a Corporate Integrity Agreement with the U.S. government.  The agreement required the Sackler Defendants to ensure that Purdue did not deceive doctors and patients again.  The Sackler Defendants promised to comply with rules that prohibit deception about Purdue opioids.  They were required to complete hours of training to ensure that they understood the rules.  They were required to report any deception. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████

213.    The 2007 Judgment and related agreements should have ended the Sackler Defendants' misconduct for good.  Instead, the Sackler Defendants decided to break the law again and again, expanding their deceptive sales campaign to make more money from more patients on more dangerous doses of opioids.

**2.      The Sackler Defendants' Misconduct from the 2007 Judgment Until Today**

214.    From the 2007 Judgment to 2018, the Sackler Defendants controlled Purdue's deceptive sales campaign. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[115] 2007-05-09 Plea Agreement.

[116] ████████████████████████████████████████████████

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████

215.    █████████████████████████████████████████
██████████████████████████████████

                    ██████████████████████████████████████
                    █████

216.    █████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████ █
███████████████████████████████████████████
████████

                    █████████████████████████████████████
                    █████████████████████████████████
                    ████
████████████████████████████████████████████
                    ██████████████████████████████████████
                    ████████

217.    The Sackler Defendants cared most of all about money.    █████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

---

██████████████████████████████████████████████████████

████████████████████████████

218.    As detailed below, the Sackler Defendants' misconduct continued from the 2007

convictions through 2018.

**a.    2007**

219.    ████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████

220.    ████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████

221.    ████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████ ████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

---

[121] ██████████████████████████████████████████████
[122] ███████████████████████████████████████



222. ████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

223. ████████████████████████████████████████

██████████ ██████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

224. ████████████████████████████████████████

████████████████████████████████████████████





225. 

---
[130] ███████████████████████████████

226. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

227. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

228. ████████████████████████████████████████

████████████████████████████████████████████████

████████████ ██████████████████████████████████

████████████████████████████████████████████████

██████████████

229. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

**b.    2008**

230. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████

131 ████████████████████████████████
132
133 ████████████
134 ████████████████
135 ████████████████████████
136 ████████████████████

231. 

232.

233.

234.



235. ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████



236. ████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████

237. ████████████████████████████████████████
██████████████████████████    ████████████████████████
████████████████████████████████████████████████████
██████████    ████████████████████████████████████
████████████████████████████████████████████████████

─────────────────────

[141] ████████████████████████████████████████████████
██████████    █████████████████████████████████
[142]
[143] █████████████████████████████████



238.

239.

240. 

241.





242.

243.

244.

245.





246. ███████████████████████████████████████

247. ███████████████████████████████████████

248. ███████████████████████████████████████



249. 



250.

251.

252.

253.

254. █████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████

255. █████████████████████████████████████████

256. █████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████

257. █████████████████████████████████████████
███████████████████████████████   ██████████████
████████████████████████████████████████████████
███████████████

258. █████████████████████████████████████████
████████████████████████████████████████████████





259.

c.      **2009**

260.

261.

262. █████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████

263. █████████████████████████████████████████████
███████████████████████████████████████████████ ███
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████ █████████████████████████████████████
████████████████ █████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████

264. █████████████████████████████████████████████
███████████████████████████ █████████████████████████

██████████████████████████████████████████████
██████████████████████████████████

██████████████████████████████████████████████
██████████████████████████████████

265. █████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████



190 ██████████████████████████████████
191 ██████████████████████████████████████████████
192 █████████████████████████████████
193 ████████████████████████████████████████████████████████
194 ██████████████████████████████
195 ██████████████████████████████
196 ███████████████████████████████



266.

267.

268.





269.

270. ██████████████████████████████████

███████████████████████████████████████

███

271. ██████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████

272. ██████████████████████████████████

████████████████████████████ ████████████

██████████████████████ ████████████████████

██████████████████ ████████████████████████

███████████████████████████ ████████████████

███████████████████████████████████████

████████

273. ██████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████





274. ██████████████████████████████████████

275. ██████████████████████████████████████

276. ██████████████████████████████████████

277. ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████

278. ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████ ████████████████████
█████████████████████████

**d.    2010**

279. ███████████████████████████████████████
███████████ ████████████████████████████████
████████████████████████████████████████████
██████████████ ███████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

280. ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████



86



286. 

**(1)      The Sackler Defendants' Control of Sales Visits**

287.

288.

235

236

237





289. 



290. ████████████████████████████████████
████████████████████████████████████████████
████████████████████████

291. ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████





292. ███████████████████████████████████

293. ███████████████████████████████████

294. ███████████████████████████████████



295.

296.

297.



**(2)** **"Region Zero"**

298.

299.

300.

301.

250
251
252
253
254
255



302.

303.

304.



305. ████████████████████████████████████████
████████████████████████████████████

306. ████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████

307. ████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████

308. ████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████

309. ████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████

310. ████████████████████████████████████████



262 ████████████████████████████████████████
263 ████████████████████████████
264 ██████████████████████████████████
265 ████████████████████████████████
266 ████████████████████████████████████
267 ██████████████████████████████
268 ████████████████████████████████████████
269 ████████████████████████████████████████
270 ████████████████████████

**e. 2011**

311. [redacted]

[redacted]

312. [redacted]

313. [redacted]

314. [redacted]

---

271 [redacted]

272 [redacted]

273 [redacted]

274 [redacted]

275 [redacted]

276 [redacted]

277 [redacted]



315.

316.

317.

████████    Purdue sat on the information and did not report it to the authorities *for more than two years*, until after the pill mill doctor had already been arrested and the Sackler Defendants had arranged for lawyers in case Crowley was questioned.[288]

318. 

319.

320.

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████

321.   ██████████████████████████████████████████



322.   ██████████████████████████████████████████

███████████████████████████████████████████████████
███████████████████████████████████████████████████

---

[293] ██████████████████████████████████████████████
[294]





327. ███████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████

328. ███████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████

329. ███████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████

330. ███████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████



336.





337. ████████████████████████████████████████████
████████████████████████████████



338. ██████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

339. ████████████████████████████████████████

340. █████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████

341. ██████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████████

---
317 ████████████████████████████████████████████
318
319
320



342. ████████████████████████████████████████████
████████████████████████████

343. ████████████████████████████████████████████
██████████████████████████████

344. ████████████████████████████████████████████
████████████████████████

345. ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████ ██████████████████████████████████████████████
██████



346. ███████████████████████████████████████
█████████████████████████████████████ ████████████
████████████████████████████████████

347. ███████████████████████████████████████
████████████████████████

**f.**    **2012**

348. ███████████████████████████████████████
██████████████████████ ██████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
█████████████████████ █████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████

349. ███████████████████████████████████████
███████████████████████████████████

350. ███████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████





351. ███████████████████████████████████████

352. ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████

353.   ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████



████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

354.   ████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████   ████████████████████████████

████████████████████████████████████████

355.   ████████████████████████████████████████

████████████████████████████████████████

344
345
346
347
348
349


356. █████████████████████████████████
████████████████████████████████████████
███████████████ ███████████████████████
██████████ ██ ██████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████

357. █████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████ █████████
███████████████████████████████

358. █████████████████████████████████
██████████████████ ████████████████ █ ███
████████████████████████████████████████
████████████████ ██ █████████████████████
████████████████████████████████████████
████████████████████████████████████████
█████████████████████ █

359. █████████████████████████████████
████████████████████████████████████████
███████████████████████ █



360. [redacted]

361. [redacted] [redacted] [redacted]

362. [redacted] [redacted] [redacted] [redacted] [redacted]

363. [redacted]

---

359 [redacted]

360 [redacted]

361 [redacted]

362 [redacted]

363 [redacted]

364 [redacted]

365 [redacted]

366 [redacted]

364.

365.

366.

367.

368.

369.

370.





371. ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

g.    2013

372. ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████ ████████████████
████████████████████████████████████████████
██████████████████

373. ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████ ██ █
███████████████████████████████



378 ███████████████████████████████
379 ████████████████████████████████████████████
██████████
380 ████████████████████████████
381 ████████████████████████████
382 ████████████████████████████
383 ████████████████████████████

374. ████████████████████████████████████████████
████████████████████████████████████████

375. ████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████ ██████████
████████████████████████████████████████████████
████████████████████████████

376. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████

377. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████

378. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

---

384 ████████████████████████████████████████████
████████████████████████

385 ████████████████████████████████████████
386
387
388



379.

380.

381.

382.





386.

387.

388.



389. ███████████████████████████████

390. ███████████████████████████████

391. 

392.

393.



394. ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████ ███████████████████████████████████
██████████████████████ █████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████ ████████████████████
████████████████████████████████████████████████████████
████████████████████████████████

395. ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████ ████████████████████
████████████████████████████████████████

396. ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████

397. ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████



413 ████████████████████████████████████████████████████
████
414
415
416
417
418
419
420
421



398. ███████████████████████████████

399. ███████████████████████████████

400. ███████████████████████████████

401. ███████████████████████████████

402. 

403.

404.

405.

406.



**h.** **2014**

407. ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████

408. ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

409. ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████

410. ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████



434 ██████████████████████████████
435 ██████████████████████████████
436 ██████████████████████████████
437 ██████████████████████████████
438 ██████████████████████████████

123



411. ████████████████████████████████

412. ████████████████████████████████

413. ████████████████████████████████

414. ████████████████████████████████████████████████

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████████████ ██████████████████████
███████████████████████████████████████████████████████
██████████████

415. ████████████████████████████████████████████████

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████

416. ████████████████████████████████████████████████

████████████████████████████████████████████████████ ███
███████████████████████████████████████████████████████
█████████████████████████████████ █████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████



447 ████████████████████████████████████████████████████
448 ██████████████████████████████████████████████████████
449 ██████████████████████████████████████████████████████
450 █████
451 ██████████████████████████████████



417. ████████████████████████████████

418. ████████████████████████████████



419. ██████████████████████████████████

**(1)     Project Tango**

420. ██████████████████████████████████





421. ███████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████



422. ███████████████████████████████████████████



423.

424.

425.





426. 

427.



428.

429.

430.

431.

**i.   2015**

432.





433.

434.

435.

436.

437.



438. ██████████████████████████████████████████████
████████████████████████████████████████

439. ██████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████

440. ██████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████ ████████████████████████
██████████████████████████

441. ██████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████

442. ██████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

485 ██████████████████████████████████████████
486 ██████████████████████████████████████████
487 ██████████████████████████████████████████
488 ██████████████████████████████████████████
489 ██████████████████████████████████████████



443. ███████████████████████████████████

444. ███████████████████████████████████

**j.    2016**

445. ███████████████████████████████████

446. ███████████████████████████████████

447. ███████████████████████████████████

448.



450.



451. ████████████████████████████████████████

452. ████████████████████████████████████████

453. ████████████████████████████████████████



454. 

455.

456.

457.



███████ ███  ████████████████████████████████████████████████████

███████████████████████████████████████

      **k.**    **2017**

458. ████████████████████████████████████████████████

████████████████████████████████████

459. ████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████ ██  ████████████████████████████████████████████

████████████████████████████████

460. ████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████ ██████████████████████████████

████

461. ████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████

---

512 ████████████████████████████████████████████

513 ██ █ ██ █ ███████ ███ ████ █████████ █ ████ ██ ███████ ███

514 ███████████████████████████████████████████████████

515 ████████████████████████████████████████

516 ████████████████████████████████████████

517 ████████████████████████████████████████

462. ███████████████████████████████████████████

████████████████████████████████████████████████████ HBO's
film was a problem for Purdue because it showed actual footage from Purdue's misleading
advertisements next to video of people who overdosed and died.[519]

463. ███████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████

464. ███████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

465. ███████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████

---

[518] ████████████████████████████████████████████

[519] 2017-05-01 "*Warning: This Drug May Kill You* Offers a Close-Up of the Opioid Epidemic," https://www.theatlantic.com/entertainment/archive/2017/05/warning-this-drug-may-kill-you-opioid-epidemic-hbo/524982/.

[520] ████████████████████████████████████████████████████████████

[521]

[522]

466. ██████████████████████████████████ ████
████████████████████████████████████████████
███████████████████████████ █████████████████
████████████████████████████████████████████
████████████████████████████████████ █

467. ██████████████████████████████████████
███ ████████████████████████████████████████
███ ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████





l.      2018

468.    **In January 2018**, Richard Sackler received a patent for a drug to treat opioid addiction—█████████████████████ Richard had applied for the patent in 2007.  He assigned it to a different company controlled by the Sackler family—Rhodes.  Richard's patent application says opioids *are* addictive.  The application calls the people who become addicted to opioids "junkies" and asks for a monopoly on a method of treating addiction.[529]



---

[529] 2018-01-09, U.S. Patent No. 9,861,628 ("a method of medication-assisted treatment for opioid addiction"); 2007-08-29, international patent publication no. WO 2008/025791 Al.

[530] ████████████████████████████████████

[531] ████████████████████████████████████

[532] ████████████████████████████████████

[533] ████████████████████████████████████

C.   **The Sackler Defendants Created Rhodes to Perpetuate and Further Profit Off of the Opioid Market that the Sackler Defendants had Created with Purdue**

473.    In or around November 2007, in the immediate aftermath of the guilty plea by Purdue and its executives regarding the company's false and misleading marketing of OxyContin, the Sackler Defendants established Rhodes.  According to a former senior manager at Purdue, "Rhodes was set up as a 'landing pad' for the Sackler family in 2007, to prepare for the possibility that they would need to start afresh following the crisis then engulfing OxyContin."[534] This landing pad was not immediately necessary though because the Sackler Defendants were able to extract millions from the opioid market for over 10 years after the guilty plea entered by Purdue.

474.    Rhodes was also an advantageous investment for the Sackler Defendants because it provided a new vehicle in which the Sackler Defendants could use to grow the market for opioids. Rhodes allowed the Sackler Defendants to capture profits off of the generic opioid market.

475.    The Sackler Defendants' involvement in Rhodes and its relationship to Purdue was not publicly known until the September 9, 2018 publication of an article in the *Financial Times*. According to the article, "Rhodes has not been publicly connected to the Sackler family before, and their ownership of the company may weaken one of their longstanding defences: that they cannot be held responsible for the opioid crisis because Purdue accounts for a small fraction of the overall prescriptions."[535] The connection between Rhodes and the Sackler Defendants was further cemented by the granting of a patent to Rhodes, which named Richard Sacker as one of the creators on the patent.[536]

---

[534]    David Crow, *How Purdue's 'one-two' punch fueled the market for opioids*, Financial Times (Sept. 9, 2018), https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c.
[535]    *Id.*
[536]    Amy Baxter, *Billionaire Drugmaker Granted Patent for Opioid Addiction*, Health Exec (Sept. 10, 2018), https://www.healthexec.com/topics/healthcare-economics/billionaire-drugmaker-granted-patent-addiction.

### 1. Similarities Between Rhodes and Purdue

476.    Despite being registered as a separate company from Purdue, the Sackler Defendants run Rhodes in the same manner as Purdue and "little distinction is made internally between the two companies."[537]

477.    Staff from Rhodes and Purdue use the same employee handbook.[538] Many of the drugs for Rhodes are made in factories owned by Purdue.[539] While Purdue produces the brand name products, such as OxyContin, Rhodes became one of the largest producers of off-patent generic opioids in the United States.[540]

478.    Plaintiffs allege upon information and belief that the Sackler Defendants were—and still are—directly involved with the daily operations and sales of Rhodes, just as they were with Purdue as discussed above. The Sackler Defendants took great care to conceal their involvement with Rhodes after the concerns of personal liability bring attributed to the Sackler Defendants in the early 2000s. While much of Rhodes business and practices have been concealed from the public, the information that is available shows that there is no reason to think the Sackler Defendants treated Rhodes any differently from Purdue in the Sackler Defendants' management of both companies.

### 2. How The Sackler Defendants Used Purdue and Rhodes Together to Further the Sackler Defendants' Scheme to Falsely Market Opioids

479.    According to the *Financial Times*, in 2016, Rhodes had a substantially larger share of prescriptions in the U.S. prescription opioid market than Purdue.[541] Purdue has often argued that it is a relatively small producer of opioids in the United States. However, when combined with Rhodes, the Sackler Defendants control up to six percent of the United States opioid market,

---

[537] *Id.*

[538] *Id.*

[539] David Crow, *Billionaire Sackler Family Owns Second Opioid Drugmaker*, Financial Times (Sept. 9, 2018), https://www.ft.com/content/2d21cf1a-b2bc-11e8-99-ca-68cf89602132.

[540] *Id.*

[541]    Crow, 'One-two' Punch, *supra* note 534.

accounting for 14.4 million prescriptions in 2016 alone.[542] The combined Rhodes and Purdue companies put the Sackler Opioid Enterprise (defined below) at seventh place among opioid makers in terms of market share—well ahead of other pharmaceutical groups such as Johnson & Johnson and Endo.[543]

480.    The Sackler Defendants utilized both Rhodes and Purdue to grow the general market for opioids so that the Sackler family would profit off improvements in the entire market. Purdue sales representatives were incentivized to expand the sales not only of Purdue products, but to expand the sales of opioids as a whole.[544] Part of a Purdue sales representative's bonus was calculated based on the size of the overall opioid market.[545] Therefore, the sales representatives were incentivized to sell doctors on all opioids, which translated to profits for the Sackler Defendants off of both name brand and generic opioid sales.

481.    Plaintiffs allege upon information and belief that the structure of incentives to promote overall opioid market growth was created by the Sackler Defendants with the express intention of growing not only Purdue sales, but also generic sales at Rhodes. While the Sackler Defendants have largely abandoned Purdue as of 2018, Plaintiffs allege upon information and belief that the Sackler Defendants continue to operate the Sackler Opioid Enterprise through Rhodes. The "landing pad" status of Rhodes has been activated. The Sackler Defendants hired a corporate restructuring expert in August of 2018 to restructure Rhodes.[546] The issuance of new patents on opioid-related drugs to Rhodes and the Sackler Defendants also indicates that the Sackler Opioid Enterprise is far from finished.

---

[542] Crow, *Billionaire*, *supra* note 539.
[543] *Id.*
[544] Crow, '*One-two*' *Punch*, *supra* note 534.
[545] *Id.*
[546] *Id.*

## V.      CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### Public Nuisance
#### (Against All Defendants)

482.     Plaintiffs incorporate the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

483.     Defendants, individually and acting through their employees and agents, and in concert with each other, have intentionally, recklessly, or negligently engaged in conduct or omissions which endanger or injure the property, health, safety or comfort of a considerable number of persons in each of Plaintiffs' jurisdictions by their production, promotion, and marketing of opioids for use by residents of each Plaintiff's jurisdiction.

484.     Defendants' acts and omissions offend, substantially interfere with, or cause damage to the public in the exercise of rights common to all, in a manner such as to offend public morals or endanger or injure the property, health, safety or comfort of a considerable number of persons.

485.     Defendants' conduct is unreasonable, intentional, and unlawful.

486.     Defendants knew of the public health hazard their conduct would create.

487.     The public nuisance is substantial and unreasonable. Defendants' actions caused and continue to cause the public health epidemic described in this Complaint.

488.     Defendants' conduct has persisted over a long period of time and caused wide-spread harm.  It has caused deaths, serious injuries, and a severe disruption of public peace, order and safety; it is ongoing, and it is producing permanent and long-lasting damage.

489.     Defendants knew and should have known that their promotion of opioids was false and misleading and that their deceptive marketing scheme and other unlawful, unfair, and fraudulent actions would create or assist in the creation of the public nuisance – i.e., the opioid epidemic.

490.     Defendants' conduct constitutes a public nuisance.

491.     Defendants' conduct directly and proximately caused injury to each Plaintiff and their residents.

492.     Defendants' actions were, at the very least, a substantial factor in opioids becoming widely available and widely used. Defendants' actions were, at the very least, a substantial factor in deceiving doctors and patients about the risks and benefits of opioids for the treatment of chronic pain. Defendants therefore participated to a substantial extent in creating and maintaining the public nuisance. Without Defendants' actions, opioid use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.

493.     Plaintiffs each suffered special injuries distinguishable from those suffered by the general public.

494.     The public nuisance created, perpetuated, and maintained by Defendants can be abated and further recurrence of such harm and inconvenience can be abated.


### SECOND CAUSE OF ACTION

**Violation of RICO, 18 U.S.C. § 1961 et seq.**
**Sackler Opioid Enterprise**
**(Against the Sackler Defendants)**

495.     Plaintiffs incorporate the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

496.     The Sackler Defendants—through their knowledge of and control over the activities of Purdue and Rhodes—conducted a an association-in-fact enterprise composed of the Sackler Defendants together with Purdue and Rhodes, and/or a legal entity enterprise consisting of Purdue and its affiliated entities, including Rhodes, that were operated by the Sackler Defendants (each alternative form of enterprise referred to collectively as the "Sackler Opioid Enterprise").  At all relevant times, the Sackler Defendants conducted and/or participated in the

conduct of the enterprise through a pattern of illegal activities (the predicate acts of mail and wire fraud, and violation of the Controlled Substances Act) to carry out the common purpose of the Sackler Opioid Enterprise, *i.e.* to unlawfully increase their personal profits and revenue from the increased and continued prescription and use of opioids manufactured by Purdue and Rhodes through: (1) disseminating false representations about the risks of using prescription opioids for long-term treatment of chronic pain; and (2), and refusing to report suspicious orders of prescription opioids that the Sackler Opioid Enterprise was aware of through the suspicious order monitoring systems in place at Purdue and Rhodes and through other sources by which Purdue and Rhodes were actually aware of diversion occurring throughout the United States and in Plaintiffs' jurisdictions.

497.    Through the racketeering activities of the Sackler Opioid Enterprise, the Sackler Defendants sought to increase and continue to derive as much unlawful profit from the manufacture and sale of prescription opioids as possible through a fraudulent scheme to increase the market for the prescription opioids marketed, manufactured and sold by the Sackler Opioid Enterprise by increasing prescriptions and use of prescription opioids through the dissemination of false marketing representations about the risks of prescription opioid use.  Then, simultaneously while improperly growing the market for prescription opioids through false marketing, the Sackler Opioid Enterprise was also directed by the Sackler Defendants to ignore suspicious orders of prescription opioids instead of identifying, reporting and halting those orders despite actual knowledge of the same.  In so doing, each of the Sackler Defendants knowingly conducted and participated in the conduct of the Sackler Opioid Enterprise by engaging in mail and wire fraud in violation of 18 U.S.C. §1962(c) and (d)

498.    The Sackler Opioid Enterprise, alleged above, is an association-in-fact enterprise that consists of the Sackler Defendants and the companies that they controlled as their alter-egos, including Purdue and Rhodes.

499.    Each of the Sackler Defendants conducted and participated in the conduct of the Sackler Opioid Enterprise by: (1) creating and directly contributing to the false narrative that

prescription opioids are safe for general use, including the nine categories of misrepresentations discussed above; (2) personally directing the sales strategies of Purdue and Rhodes to increase sales of prescription opioids despite repeated warnings of the dangers and addiction risks; (3) developing and implementing a sales strategy that incentivized growing the entire market for prescription opioids, including generic brands; (4) developing and implementing suspicious order monitoring systems for Purdue and Rhodes but then systematically ignoring those systems and refusing to report suspicious orders of controlled substances; (5) directing the regular payment of Purdue's profits, each payment consisting of hundreds of millions of dollars, directly to the Sackler family; and (6) actively concealing the acts of the enterprise, especially concealing the involvement of the Sackler family in the false marketing and creation of the opioid epidemic.

500.    This conduct directly furthered the common purpose of increasing profit and sales by increasing the volume of prescriptions written and corresponding use of prescription opioids manufactured by Purdue and Rhodes through the use of knowing and intentional dissemination of false and misleading information about the drugs Purdue and Rhodes manufactured, and by a knowing and willful refusal to identify and report suspicious orders.

501.    Specifically, the Sackler Defendants worked together to exercise control over the activities of Purdue and Rhodes such that Purdue operated as a front for the Sackler Defendants and allowed them to coordinate their approach to the marketing and sale of prescription opioids by Purdue.  The Sackler Defendants utilized Purdue to increase the market and demand for prescription opioids in general and to capture profits from name brand opioid prescriptions, such as OxyContin. Then, the Sackler Defendants established Rhodes to extract further profits from the opioid market, created from the deceptive marketing issued through Purdue, as one of the largest producers of generic opioids in the market. Through all of these activities, the Sackler Defendants maintained a continuous pattern of controlling and directing Purdue and Rhodes to refuse to report suspicious orders of controlled substances.

502.    The Sackler Defendants conducted and directed the affairs of Purdue and Rhodes such that the Sackler Defendants caused them to carry out the acts of the Sackler Opioid

Enterprise and to obscure the involvement of each of the Sackler Defendants in the creation and perpetuation of the opioid epidemic. The Sackler Defendants stripped Purdue of any profits made from the sales of prescription opioids and transferred those profits directly to the Sackler Opioid Enterprise, to wit the Sackler family. The Sackler Defendants also secretly established Rhodes as a vehicle to continue the Sackler Opioid Enterprise should Purdue's role in the enterprise be compromised due to legal action or criminal prosecution.

503.    At all relevant times, the Sackler Opioid Enterprise: (a) had an existence separate and distinct from the individual Sackler Defendants, Purdue, and Rhodes; (b) was separate and distinct from the pattern of racketeering in which the Sackler Opioid Enterprise engaged; (c) was an ongoing and continuous organization consisting of individuals, persons, and legal entities, including each of the Sackler Defendants; (d) was characterized by interpersonal relationships between and among each member of the Sackler Opioid Enterprise, including between the Sackler Defendants; and (e) had sufficient longevity for the enterprise to pursue its purpose and function as a continuing unit.

504.    The Sackler Defendants engaged in the Sackler Opioid Enterprise are systematically linked through contractual relationships, financial ties, personal relationships, and continuing coordination of activities in relation to Purdue and Rhodes, as spearheaded by the Sackler Defendants.

505.    The Sackler Defendants conducted and participated in the conduct of the Sackler Opioid Enterprise through a pattern of racketeering activity, including violations of 18 U.S.C. § 1961(1)(B) and (C), including: (1) Mail Fraud – 18 U.S.C. 1341; (2) Wire Fraud – 18 U.S.C. § 1343; and (3) Felonious manufacture, importation, receiving, concealment, buying selling, or otherwise dealing in a controlled substance or listed chemical punishable under any law of the United States, including but not limited to 21 U.S.C. § 843(a)(4)(A) ("Controlled Substance Felony").

506.    The Sackler Defendants' conduct and participation in the Sackler Opioid Enterprise allowed them to increase profits and revenue by changing prescriber behavior and

public perception regarding the use of prescription opioids—resulting in an expanding market for prescription opioids through false representations—while simultaneously directing the Sackler Opioid Enterprise to refrain from identifying and reporting suspicious orders of prescription opioids that the Sackler Opioid Enterprise was aware of through the suspicious order monitoring systems in place at Purdue and Rhodes and through other sources by which Purdue and Rhodes were actually aware of diversion occurring throughout the United States and in Plaintiffs' jurisdictions.

507.    The Sackler Defendants each committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (*i.e.* violations of 18 U.S.C. §§ 1341 and 1343, and 21 U.S.C. § 843(a)(4)(A)) within the past ten years.  The multiple acts of racketeering activity that the Sackler Defendants, committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."  The racketeering activity was made possible by the Sackler Defendants control over and participation in the Sackler Opioid Enterprise and through the regular use of the facilities, services, distribution channels, and employees of the Sackler Opioid Enterprise, and the U.S. Mail and interstate wire facilities.

508.    The Sackler Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

- Mail Fraud: The Sackler Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

- Wire Fraud: The Sackler Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

- Controlled Substance Felony: The Sackler Defendants violated 21 U.S.C. § 843(a)(4)(A) by knowingly and/or intentional causing Purdue to furnish false or fraudulent information in and/or omit material information from, documents filed with the DEA.

509.    The Sackler Defendants conducted their pattern of racketeering activity in this jurisdiction and throughout the United States through the Sackler Opioid Enterprise.

510.    The Sackler Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principles in the violation of 18 U.S.C. § 1341, 18 U.S.C. § 1343, and 21 U.S.C. § 843(a)(4)(A).

511.    The Sackler Defendants hid from the general public and suppressed and/or ignored warnings from third parties, whistleblowers and governmental entities about the reality of the impact caused by the Sackler Opioid Enterprise's misrepresentations and the suspicious orders that the Sackler Defendants directed the Sackler Opioid Enterprise to fill on a daily basis—leading to the diversion of hundreds of millions of doses of prescriptions opioids into the illicit market. The Sackler Defendants also took great care to hide from the public their ownership and involvement with Rhodes and the sale of generic opioids. Their involvement with Rhodes was not discovered until September of 2018, and thus the full extent of the Sackler Opioid Enterprise was hidden from the public and regulators alike.

512.    The Sackler Defendants, with knowledge and intent, agreed to the overall objective of their fraudulent scheme and participated in the common course of conduct to commit acts of fraud and indecency in manufacturing and distributing prescription opioids.

513.    Indeed, for the Sackler Defendants' fraudulent scheme to work, each of the Sackler Defendants had to agree to implement the tactics described herein.  For example, if just one member of the Sackler Opioid Enterprise had broken ranks, they would have toppled the entire enterprise and uncovered the level of direction and control exercised by the Sackler Defendants, and the illegal activities that the Sackler Defendants directed the Sackler Opioid Enterprise to engage in.

514.    As described herein, the Sackler Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities that supported the common purpose of obtaining significant amounts of unlawful money and revenue through two complimentary activities regarding the marketing, manufacture and sale or

highly addictive and dangerous drugs while refusing to identify and report suspicious orders, all conducted with the common purpose of allowing the Sackler Defendants to unlawfully enrich themselves from the conduct of the Sackler Opioid Enterprise.  The predicate acts all had similar results, participants, victims, and methods of commission.  The predicate acts were related and not isolated events.

515.    The predicate acts all had the purpose of creating an unchecked demand and supply for highly addictive controlled substances— i.e. the opioid epidemic—which substantially injured Plaintiffs' business and property, and contributed to its duration and severity.  These predicates acts had the foregoing effect while simultaneously generating billion-dollar revenue and profits for the Sackler Defendants. The predicate acts were committed or caused to be committed by the Sackler Defendants through their control over and direction of the Sackler Opioid Enterprise and in furtherance of its fraudulent scheme.

516.    The pattern of racketeering activity alleged herein and the Sackler Opioid Enterprise are separate and distinct from each other. Likewise, the Sackler Defendants are distinct from the enterprise.

517.    The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future unless enjoined by this Court.

518.    Many of the precise dates of the Sackler Defendants' criminal actions at issue here have been hidden by Defendants and cannot be alleged without access to the Sackler Defendants' and Rhodes's books and records. Indeed, an essential part of the successful operation of the Sackler Opioid Enterprise alleged herein depended upon secrecy.

519.    By knowingly and willfully directing the Sackler Opioid Enterprise to disseminate false marketing statements and refuse to report and halt suspicious orders of the prescription drugs sold by the Sackler Opioid Enterprise, the Sackler Defendants engaged in a fraudulent scheme and unlawful course of conduct constituting a pattern of racketeering activity.

520.    It was foreseeable, and even intended, by the Sackler Defendants that Plaintiffs would be harmed when they refused to report and halt suspicious orders, because their marketing misconduct and violation of the duties imposed by the CSA and Code of Federal Regulations allowed widespread diversion of prescription opioids out of appropriate medical channels and into the illicit drug market—causing the opioid epidemic that the CSA was intended to prevent.

521.    The last racketeering incident occurred within five years of the commission of a prior incident of racketeering.

522.    The Sackler Defendants' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiffs injury in their business and property. The Sackler Defendants' pattern of racketeering activity, including the marketing misrepresentations and refusal to identify, report, and halt suspicious orders – all of which occurred under the control and at the direction of the Sackler Defendants – logically, substantially and foreseeably cause an opioid epidemic.  Plaintiffs were injured by the Sackler Defendants' pattern of racketeering activity and the opioid epidemic that they created.

523.    The Sackler Defendants knew that the opioids manufactured and sold by the Sackler Opioid Enterprise were unsuited to treatment of long-term, chronic, non-acute, and non-cancer pain, or for any other use not approved by the FDA, and knew that opioids were highly addictive and subject to abuse.  Nevertheless, the Sackler Defendants engaged in a scheme of deception, that utilized the mail and wires as part of their fraud, in order to increase sales of their opioid products by refusing to identify, report suspicious orders of prescription opioids that they knew were highly addictive, subject to abuse, and were actually being diverted into the illegal market.

524.    The Sackler Defendants' predicate acts and pattern of racketeering activity were a cause of the opioid epidemic which has injured Plaintiffs in the form of substantial losses of money and property that logically, directly and foreseeably arise from the opioid-addiction epidemic.

525.     Specifically, Plaintiffs' injuries, as alleged throughout this complaint, and expressly incorporated herein by reference, include or may include:

(a)     Losses caused by the decrease in funding available for Plaintiffs' public services for which funding was lost because it was diverted to other public services designed to address the opioid epidemic;

(b)     Costs for providing healthcare and medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths;

(c)     Costs of training emergency and/or first responders in the proper treatment of drug overdoses;

(d)     Costs associated with providing police officers, firefighters, and emergency and/or first responders with naloxone—an opioid antagonist used to block the deadly effects of opioids in the context of overdose;

(e)     Costs associated with emergency responses by police officers, firefighters, and emergency and/or first responders to opioid overdoses;

(f)     Costs for providing mental-health services, treatment, counseling, rehabilitation services, and social services to victims of the opioid epidemic and their families;

(g)     Costs for providing treatment of infants born with opioid-related medical conditions, or born dependent on opioids due to drug use by mother during pregnancy;

(h)     Costs associated with law enforcement and public safety relating to the opioid epidemic, including but not limited to attempts to stop the flow of opioids into local communities, to arrest and prosecute street-level dealers, to prevent the current opioid epidemic from spreading and worsening, and to deal with the increased levels of crimes that have directly resulted from the increased homeless and drug-addicted population;

(i) Costs associated with increased burden on Plaintiffs' judicial systems, including increased security, increased staff, and the increased cost of adjudicating criminal matters due to the increase in crime directly resulting from opioid addiction;

(j) Costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation;

(k) Loss of tax revenue due to the decreased efficiency and size of the working population in Plaintiffs' communities;

(l) Losses caused by diminished property values in neighborhoods where the opioid epidemic has taken root; and

(m) Losses caused by diminished property values in the form of decreased business investment and tax revenue.

526. Plaintiffs' injuries were proximately caused by the Sackler Defendants' racketeering activities because they were the logical, substantial and foreseeable cause of Plaintiffs' injuries. But for the opioid-addiction epidemic created by the Sackler Defendants' conduct, Plaintiffs would not have lost money or property.

527. Plaintiffs' injuries were directly caused by the Sackler Defendants' pattern of racketeering activities.

528. Plaintiffs are most directly harmed and there are no other Plaintiffs better suited to seek a remedy for the economic harms at issue here.

529. Plaintiffs seek all legal and equitable relief as allowed by law, including, inter alia, actual damages; treble damages; equitable and/or injunctive relief in the form of court-supervised corrective communication, actions and programs; forfeiture as deemed proper by the Court; attorney's fees; all costs and expenses of suit; and pre- and post-judgment interest, including, inter alia:

(a) Actual damages and treble damages, including pre-suit and post-judgment interest;

157

(b)     An order enjoining any further violations of RICO;

(c)     An order enjoining any further violations of any statutes alleged to have been violated in this Complaint;

(d)     An order enjoining the commission of any tortious conduct, as alleged in this Complaint;

(e)     An order enjoining any future marketing or misrepresentations regarding the health benefits or risks of prescription opioids use, except as specifically approved by the FDA;

(f)     An order enjoining any future marketing of opioids through non-branded marketing including through Front Groups, Key Opinion Leaders, websites, or in any other manner alleged in this Complaint that deviates from the manner or method in which such marketing has been approved by the FDA;

(g)     An order enjoining any future marketing to vulnerable populations, including but not limited to, persons over the age of fifty-five, anyone under the age of twenty-one, and veterans;

(h)     An order compelling the Defendants to make corrective advertising statements that shall be made in the form, manner and duration as determined by the Court, but not less than print advertisements in national and regional newspapers and medical journals, televised broadcast on major television networks, and displayed on their websites, concerning: (1) the risk of addiction among patients taking opioids for pain; (2) the ability to manage the risk of addiction; (3) pseudoaddiction is really addiction, not a sign of undertreated addiction; (4) withdrawal from opioids is not easily managed; (5) increasing opioid dosing presents significant risks, including addiction and overdose; (6) long term use of opioids has no demonstrated improvement of function; (8) use of time-released opioids does not prevent addiction; (9) abuse-deterrent formulations do not prevent opioid abuse; and

158

(10) that manufacturers and distributors have duties under the CSA to monitor, identify, investigate, report and halt suspicious orders and diversion but failed to do so;

(i)     An order enjoining any future lobbying or legislative efforts regarding the manufacturer, marketing, distribution, diversion, prescription, or use of opioids;

(j)     An order requiring all Defendants to publicly disclose all documents, communications, records, data, information, research or studies concerning the health risks or benefits of opioid use;

(k)     An order prohibiting all Defendants from entering into any new payment or sponsorship agreement with, or related to, any: Front Group, trade association, doctor, speaker, CME, or any other person, entity, or association, regarding the manufacturer, marketing, distribution, diversion, prescription, or use of opioids;

(l)     An order establishing a National Foundation for education, research, publication, scholarship, and dissemination of information regarding the health risks of opioid use and abuse to be financed by the Defendants in an amount to be determined by the Court;

(m)     An order enjoining any diversion of opioids or any failure to monitor, identify, investigate, report and halt suspicious orders or diversion of opioids;

(n)     An order requiring all Defendants to publicly disclose all documents, communications, records, information, or data, regarding any prescriber, facility, pharmacy, clinic, hospital, manufacturer, distributor, person, entity or association regarding suspicious orders for or the diversion of opioids;

(o)     An order divesting each of the Sackler Defendants of any interest in, and the proceeds of any interest in, the Sackler Opioid Enterprise, including any

interest in property associated with Purdue and Rhodes, or any other pharmaceutical company in which any of the Sackler Defendants have an ownership stake;

(p)     Dissolution and/or reorganization of any trade industry organization, Front Group, or any other entity or association associated with the Sackler Opioid Enterprise identified in this Complaint, as the Court sees fit;

(q)     Dissolution and/or reorganization of any Company Defendant named in this Complaint as the Court sees fit;

(r)     Suspension and/or revocation of the license, registration, permit, or prior approval granted to any Defendant, entity, association or enterprise named in the Complaint regarding the manufacture or distribution of opioids;

(s)     Forfeiture as deemed appropriate by the Court; and

(t)     Attorney's fees and all costs and expenses of suit.

### THIRD CAUSE OF ACTION

### Negligent Misrepresentation
### (Against All Defendants)

530.    Plaintiffs incorporate herein by reference all of the allegations in this complaint.

531.    A defendant is liable for negligent misrepresentation where, in the course of its business, profession or employment, or in any other transaction in which it has a pecuniary interest, it supplies false information for the guidance of others in their business transactions and where the defendant fails to exercise reasonable care or competence in obtaining or communicating the false information at issue.

532.    Defendants are liable for the pecuniary loss caused to Plaintiffs by their justifiable reliance upon the information.  In the course of their businesses, Defendants made and caused to be made affirmatively false statements about prescription opioids, including, but not limited to, statements and omissions concerning the safety and efficacy of prescription opioids and the risk

of addiction and overdose associated therewith.  Defendants failed to exercise reasonable care and competence in communicating the false information.

533.    Defendants wrongfully concealed the falsity of its statements, the truth about which Plaintiffs did not discover until recently despite exercising due diligence.  Plaintiffs, their agents, persons on whom Plaintiffs and their agents justifiably relied and the public justifiably relied on the false information the Defendants provided, both directly and indirectly.  As a result, Plaintiffs proceeded under the misapprehension that the opioid crisis was a result of conduct by persons other than defendants.  As a result, each Plaintiff was prevented from taking more effective and earlier steps to respond to the opioid crisis.

534.    Had Plaintiffs known the truth about the concealed facts, each Plaintiff would have taken steps to correct the false and misleading information and also would not have authorized and paid for certain prescription opioid treatments for its employees and inhabitants.

535.    Each Defendant's dissemination of false statements demonstrated a conscious disregard for the rights and safety of other persons that had a great probability of causing substantial harm.

536.    As a direct and proximate result of the Defendants' affirmatively false statements, each Plaintiff suffered damages.


### FOURTH CAUSE OF ACTION

**Fraudulent Concealment**
**(Against All Defendants)**

537.    Plaintiffs incorporate herein by reference all of the allegations in this complaint.

538.    At all times relevant, each Defendant concealed and intentionally failed to disclose material facts known to it including that: (a) there was no basis for making claims as to prescription opioids' safety or efficacy for the treatment of certain indications for which each Defendant promoted them; and (b) there was no basis for its representations concerning the risk

of addiction and overdose resulting from the use of prescription opioids, which each Defendant substantially understated.

539.    Each Defendant intended the omission of the concealed facts to deceive each Plaintiff.

540.    Plaintiffs were unaware of the concealed facts.  Plaintiffs, their agents, persons on whom Plaintiffs and their agents justifiably relied and the public justifiably relied on the false information the Defendants provided, both directly and indirectly, as Defendants intended.  As a result, each Plaintiff proceeded under the misapprehension that the opioid crisis was a result of conduct by persons other than defendants and was prevented from taking more effective and earlier steps to respond to the opioid crisis.

541.    Had Plaintiffs known the truth about the concealed facts, each Plaintiff would have taken other steps to correct the false information and also would not have authorized and paid for certain prescription opioid treatments for its employees and inhabitants.

542.    Each Defendant's failure to disclose information about the true level of addictiveness of prescription opioids deceived Plaintiffs and was a substantial factor in causing each Plaintiff to pay for prescription opioids for uses that were not medically necessary. Each Plaintiff was damaged due to its justified reliance on each of Defendant's concealments, which were made with oppression, fraud or malice.

## FIFTH CAUSE OF ACTION

### Unjust Enrichment
### (Against All Defendants)

543.    Plaintiffs incorporate herein by reference all of the allegations in this complaint.

544.    As an expected and intended result of their conscious wrongdoing as set forth in this Complaint, Defendants have profited and benefited from the increase in the distribution  and

purchase of opioids within Plaintiffs' communities, including from opioids foreseeably and deliberately diverted within and into Plaintiffs' communities.

545.    Unjust enrichment arises not only where an expenditure by one party adds to the property of another, but also where the expenditure saves the other from expense or loss.

546.    Plaintiffs have expended substantial amounts of money in an effort to remedy or mitigate the societal harms caused by Defendants' conduct.

547.    These expenditures include the provision of healthcare services and treatment services to people who use opioids.

548.    These expenditures have helped sustain Defendants' businesses.

549.    Plaintiffs have conferred a benefit upon Defendants by paying for Defendants' externalities:  the cost of the harms caused by Defendants' improper distribution practices.

550.    Defendants were aware of these obvious benefits, and their retention of the benefit is unjust.

551.    Plaintiffs have paid for the cost of Defendants' externalities and Defendants have benefited from those payments because they allowed them to continue providing customers with a high volume of opioid products. Because of their deceptive marketing of prescription opioids, Defendants obtained enrichment they would not otherwise have obtained. Because of their conscious failure to exercise due diligence in preventing diversion, Defendants obtained enrichment they would not otherwise have obtained. The enrichment was without justification and Plaintiffs lack a remedy provided by law.

552.    Defendants have unjustly retained benefits to the detriment of Plaintiffs, and Defendants' retention of such benefits violates the fundamental principles of justice, equity, and good conscience.

553.    Defendants' misconduct alleged in this case is ongoing and persistent.

554.    Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur, and is not

part of the normal and expected costs of a local government's existence.  Plaintiffs allege wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

555.    Plaintiffs have incurred expenditures for special programs over and above Plaintiffs' ordinary public services.

556.    Plaintiffs seek an order compelling Defendants to disgorge all unjust enrichment to Plaintiffs; and awarding such other, further, and different relief as this Honorable Court may deem just.

## PRAYER FOR RELIEF

557.    Plaintiffs respectfully request that this Court enter an order of judgment  granting all relief requested in this complaint, and/or allowed at law or in equity, including:

    (a)    abatement of the nuisance;

    (b)    actual damages;

    (c)    treble or multiple damages and civil penalties as allowed by statute;

    (d)    punitive damages;

    (e)    exemplary damages;

    (f)    disgorgement of unjust enrichment;

    (g)    equitable and injunctive relief in the form of Court-enforced corrective action, programs, and communications;

    (h)    forfeiture, disgorgement, restitution and/or divestiture of proceeds and assets;

    (i)    attorneys' fees;

    (j)    costs and expenses of suit;

    (k)    pre- and post-judgment interest; and

    (l)    such other and further relief as this Court deems appropriate.

## JURY DEMAND

Plaintiffs hereby demand trial by jury on all claims so triable.

Dated: March 18, 2019                    /s/Laura J. Baughman
                                         Laura J. Baughman, NY Reg. # 4173399
                                         Russell W. Budd
                                         J. Burton LeBlanc, IV
                                         Christine C. Mansour
                                         **BARON & BUDD, P.C.**
                                         3102 Oak Lawn Avenue, Suite 1100
                                         Dallas, TX 75219
                                         Tel.: 214-521-3605
                                         Fax: 214-520-1181
                                         lbaughman@baronbudd.com
                                         rbudd@baronbudd.com
                                         bleblanc@baronbudd.com
                                         cmansour@baronbudd.com

                                         Roland K. Tellis
                                         Mark P. Pifko
                                         Sterling Cluff
                                         Jay M. Lichter
                                         Elizabeth Smiley
                                         **BARON & BUDD, P.C.**
                                         15910 Ventura Boulevard, Suite 1600
                                         Los Angeles, CA 91436
                                         Tel.: 818-839-2333
                                         Fax: 818-986-9698
                                         rtellis@baronbudd.com
                                         mpifko@baronbudd.com
                                         scluff@baronbudd.com
                                         jlichter@baronbudd.com
                                         esmiley@baronbudd.com

                                         Anthony J. Majestro
                                         J.C. Powell
                                         James S. Nelson
                                         Christina L. Smith
                                         **POWELL & MAJESTRO, PLLC**
                                         405 Capitol Street, Suite P-1200
                                         Charleston, WV 25301
                                         Tel.: 304-346-2889
                                         Fax: 304-346-2895
                                         amajestro@powellmajestro.com
                                         jcpowell@powellmajestro.com
                                         jnelson@powellmajestro.com
                                         csmith@powellmajestro.com

Peter J. Mougey
Troy Rafferty
Archie C. Lamb, Jr.
Page A. Poerschke
Laura S. Dunning
Jeffrey Gaddy
**LEVIN, PAPANTONIO, THOMAS,**
**MITCHELL, RAFFERTY & PROCTOR, P.A.**
316 S. Baylen Street, Suite 600
Pensacola, FL 32502-5996
Tel.: 850-435-7068
Fax: 850-436-6068
pmougey@levinlaw.com
trafferty@levinlaw.com
alamb@levinlaw.com
ppoerschke@levinlaw.com
ldunning@levinlaw.com
jgaddy@levinlaw.com


Paul T. Farrell, Jr.
M. Bert Ketchum, III
**Greene, Ketchum, Farrell,**
        **Bailey & Tweel, LLP**
419 - 11th Street (25701)/ P.O. Box 2389
Huntington, West Virginia 25724-2389
Phone:  800.479.0053 or 304.525.9115
Fax:     304.529.3284
paul@greeneketchum.com
bert@greeneketchum.com

R. Edison Hill (WVSB No. 1734)
James C. Peterson (WVSB No. 2880)
Harry C. Deitzler (WVSB No. 981)
Aaron L. Harrah (WVSB No. 9937)
Sandra B. Harrah (WVSB No. 7130)
Douglas A. Spencer (WVSB No. 9369)
**HILL, PETERSON, CARPER,**
  **BEE & DEITZLER, PLLC**
NorthGate Business Park
500 Tracy Way
Charleston, WV  25311
Tel.:  304-345-5667
Fax:  304-345-1519
jcpeterson@hpcbd.com
rehill@hpcbd.com
HGDeitzler@hpcbd.com
aaron@hpcbd.com
sandra@hpcbd.com
doug@hpcbd.com


Michael J. Fuller, Jr.
Amy J. Quezon
**MCHUGH FULLER LAW GROUP, PLLC**
97 Elias Whiddon Rd.
Hattiesburg, MS  39402
Tel.: 601-261-2220
Fax: 601-261-2481
mike@mchughfuller.com
amy@mchughfuller.com

168